**Wanda A. PLAKIO, Plaintiff,**

v.

**The CONGREGATIONAL HOME, INC., d/b/a Brewster Place, Defendant.**

No. 93–4222–SAC.

United States District Court, D. Kansas.

July 20, 1995.

Donald R. Hoffman, Mindy B. Rogovin, Tilton & Hoffman, Topeka, KS, for plaintiff.

J. Franklin Hummer, Davis, Unrein, Hummer, McCallister & Buck, Topeka, KS, for The Congregational Home, Inc.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's motion for summary judgment (Dk. 89). This is an employment discrimination case for sexual harassment and retaliatory discharge brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The plaintiff, Wanda Plakio, worked as a certified nurse's assistant ("CNA") for the defendant, The Congregational Home, Inc. ("Brewster Place") from October of 1989 until her termination on February 23, 1993. She claims her supervisors created a hostile work environment when they required her to give perineal care to one resident in a manner that sexually gratified the resident. She further alleges the defendant discharged her after she filed in May of 1992 a discrimination complaint with the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC") charging sex discrimination and harassment.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of

fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

■ The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case." *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). "'The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.'" *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the non-moving party. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

■ More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548,

2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

■ The plaintiff's written opposition to the summary judgment motion is deficient in several procedural respects. First, the plaintiff entitles her filing a "Motion in Opposition to Defendant's Motion for Summary Judgment," yet she requests as relief only the denial of the defendant's motion. A party that merely seeks to oppose a summary judgment motion need only file a response and memorandum, not another motion. *See* D.Kan.Rule 206(b). Second, the plaintiff does not submit a statement of *controverted* facts and fails to reference, controvert or even mention the defendant's statement of uncontroverted facts. Instead, the plaintiff offers her own statement of *uncontroverted* facts. As the court has said on a previous occasion, this practice does not satisfy the requirements of our local rules:

> [T]he court must point out the parties' failure to follow proper procedure for responding to a motion for summary judgment. As required by D.Kan.Rule 206(c), a party's memorandum in opposition to a motion for summary judgment must begin with "a concise statement of material facts as to which the party contends a genuine issue exists." In other words, the nonmoving party must file a statement of *controverted,* not uncontroverted, facts. In addition, "[e]ach fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the records upon which the opposing party relies, *and* if applicable, shall state the number of movant's fact that is disputed." (emphasis added). In practice, the courts have tolerated different practices so long as they include specific citations to the record and directly refer to the movant's statement of facts by paragraph number. By not meeting these basic requirements a party runs the risk that "[a]ll material facts set forth

in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." D.Kan.Rule 206(c).

*Big Tree Enterprises, Ltd. v. Mabrey,* No. 93–4024–SAC, 1994 WL 191996, 1994 U.S. Dist. LEXIS 6403 (D.Kan. Apr. 15, 1994). Finally, the plaintiff's opposition was due on March 1, 1995. *See* D.Kan.Rule 206(b); Fed. R.Civ.P. 6(e). She, however, did not file it until March 6, 1995, and did not ask for an extension of time or seek leave of the court for the late filing. "The failure to file a brief or response within the time specified within this rule shall constitute a waiver of the right thereafter to file such brief or response, except upon a showing of excusable neglect." D.Kan.Rule 206(g). The plaintiff's failure to controvert specifically the defendant's statement of uncontroverted facts and failure to file a timely response are independently sufficient grounds for granting the defendant's motion.

## STATEMENT OF UNCONTROVERTED FACTS

For purposes only of this motion for summary judgment, the court considers the following statement of facts to be uncontroverted.

1. Wanda Plakio worked at Brewster Place from approximately November of 1989 to February 1993 as a CNA.

2. Plakio and the other CNAs at Brewster Place performed perineal care on certain patients. The CNAs performed this care by themselves and as a team. The procedure used for perineal care varied depending on the patient.

3. Jane Doe resides on the medical one floor at Brewster Place and receives perineal care. During her deposition, Jane Doe described herself as a 71–year old woman who has suffered from multiple sclerosis for approximately nineteen years and has resided at Brewster Place for the last ten years. Unable to use her legs, she has used a wheelchair for approximately fourteen years. She has a permanent catheter and a history of urinary tract infections.

4. The perineal care procedure used on Jane Doe was unlike that used on any other Brewster Place patient. Jane Doe was a demanding patient who would ridicule and embarrass the CNAs. Jane Doe insisted on a particular procedure for perineal care that took as long as one-half hour to complete. Jane Doe became upset unless the assigned CNAs met her requests. Plakio and the other CNAs were embarrassed and disturbed by the requested procedure as they believed it amounted to performing a sexual act on Jane Doe. The CNAs that were deposed recalled that Jane Doe would "move around and groan" during the perineal care.

5. Plakio worked the evening shift on the medical one floor. She was not the only evening shift CNA assigned to perform perineal care on Jane Doe. Whenever it was her assignment, Plakio followed Jane Doe's instructions for perineal care.

6. Plakio and the other CNAs assigned to the evening shift frequently complained to their supervisors about the manner of perineal care required by Jane Doe. The subject of this care was also raised at group meetings attended by the CNAs and their supervisors. The supervisors typically responded to these complaints and concerns that it was a CNA's duty to perform the perineal care as requested by Jane Doe. The supervisors also explained that this special care was required because Jane Doe was more susceptible to diseases and infections in the genital area. When asked the consequences of refusing Jane Doe's request, the supervisors told the CNAs that if the patient complained then the CNA would receive a written reprimand. Vivian Reynoso, one of Plakio's supervisors and eventually Brewster Place's Director of Nursing, told the plaintiff and another CNA that she would look into getting a doctor's order to change Jane Doe's perineal care. When Reynoso was later asked if she had completed her inquiry, Reynoso told Plakio and the other CNA, "No, and if you can't leave it as is, find another job." Plakio complained only to her female supervisors about Jane Doe's perineal care.

7. The CNAs assigned to the day shift on the medical one floor performed perineal care on Jane Doe in the morning. The day

shift CNAs were more likely to refuse Jane Doe's requests for the extended care procedure. Their refusal apparently never became a significant issue at Brewster Place.

8. The CNAs working the medical one floor were typically women. A male CNA occasionally worked on this floor.

9. "The plaintiff filed a complaint with the Kansas Human Rights Commission in May of 1992 regarding the conduct of defendant. Plaintiff's claim was dismissed February 16, 1993 due to jurisdictional problems."[1]

10. Plakio called in sick on February 17 and 18, 1993. The next two days, February 19 and 20, were her regularly scheduled days off.

11. When Plakio reported for work on Sunday, February 21, 1993, at 2:30 p.m., her supervisors said she could not begin work without a physician's release. Plakio did not have a physician's release so she did not work Sunday. Her supervisors also told her to call Mr. Schmoller, the Executive Director at Brewster Place if she had a problem with this requirement for returning to work.

12. The next day, Plakio followed her supervisor's advice and called Schmoller. He was not there when Plakio called. Schmoller returned her call around 1:00 p.m. and told her that he expected her to report to work as scheduled with a physician's release. Because Plakio was to report to work that same day at 2:30 p.m., Schmoller gave her until the next day, February 23, 1993, to obtain the release. Plakio did not get a release the next day and called Schmoller with the news. Schmoller told her this left him with no choice but to terminate her. Plakio never returned to work.

13. During her employment at Brewster Place, Plakio received an employee manual that contained the following provision on sick leave:

Supervisors, Department Directors and Administration may require a physician's return-to-work certificate for employees who have been absent from their job duties for one to three days. A physician's return-to-work will be required for an employee who has been absent four or more days.

It also contained the following language on infectious illnesses:

Brewster Place maintains an active infection control program with provisions for insuring high quality care by the physical examination requirements and employee orientation and in-service education in infection control. The infection control policy is posted in each department. Although good attendance is stressed, an employee should not expose residents to any contagious diseases—disease. A physician's return to work certificate will be required after an absence of four days or more for illness. Flu shots are offered to employees each year at no charge. Although not required, the injections are provided to protect from flu, colds and other respiratory infections.

14. Another female CNA has testified that Brewster Place did not require a doctor's note from her when she missed more than one day of work.

15. During her tenure as personnel coordinator and human resources coordinator at Brewster Place, which overlapped Plakio's employment there, Shirley Daniel observed that besides Plakio other employees had been required to obtain a physician's release upon returning from sick leave and that department directors regularly and frequently imposed this requirement. Ms. Daniel could not recall another instance where an employee refused to provide a physician's release.

### SEXUAL HARASSMENT

Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer ... to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion,

---

**1.** This is an allegation found at page two of the plaintiff's memorandum. It is not included anywhere in her statement of facts, and no copy of the KHRC complaint is included in the record. There is attached deposition testimony that refers to the administrative charge, and the defendant does not dispute that the plaintiff filed these charges. For these reasons, the court will treat this mere allegation as a fact.

sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "Without question, when a supervisor sexually harasses a subordinate **because of the subordinate's sex,** that supervisor 'discriminate[s]' on the basis of sex." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (emphasis added).

"[A] plaintiff may establish a violation of Title VII by proving that discrimination **based on sex** has created a hostile[2] or abusive work environment." *Meritor Savings Bank v. Vinson,* 477 U.S. at 66, 106 S.Ct. at 2405 (1986) (emphasis added); *see also Hicks v. Gates Rubber Co.,* 928 F.2d 966, 968 (10th Cir.1991). A hostile work environment is one that "is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2405). To be actionable, the offensive sexual conduct must actually alter the plaintiff's conditions of employment and must be "severe or pervasive enough to create" an environment that a reasonable person would consider hostile or abusive. *Harris,* — U.S. at —, 114 S.Ct. at 370.

The elements to a hostile-environment sexual-harassment claim are: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the plaintiff's sex; (4) the alleged harassment affected a term, condition, or privilege of employment; and (5) the defendant employer knew or should have known of the harassment and failed to take proper remedi-

al action. *Kopp v. Samaritan Health System, Inc.,* 13 F.3d 264, 269 (8th Cir.1993); *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 619–20 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th Cir.1982); *McCoy v. Johnson Controls World Services,* 878 F.Supp. 229, 232 (S.D.Ga.1995); *Ball v. City of Cheyenne, Wyo.,* 845 F.Supp. 803, 809 (D.Wyo. 1993), *aff'd in part and rev'd in part on other grounds,* 54 F.3d 664 (10th Cir.1995); *Carreno v. Local Union No. 226,* No. 89–4083–S, 1990 WL 159199, 1990 U.S. Dist. LEXIS 13817 (D.Kan. Sept. 27, 1990) (Saffels, J.); *Ramirez v. Bravo's Holding Co.,* No. 94–2396–GTV, 1995 WL 113490, 1995 U.S. Dist. LEXIS 3377 (D.Kan. Mar. 15, 1995) (Rushfelt, Mag.); *see Spain v. Gallegos,* 26 F.3d 439, 447 (3rd Cir.1994). On such claims, "the key issue 'is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Kopp,* 13 F.3d at 269 (quoting *Harris,* — U.S. at —, 114 S.Ct. at 372 (Ginsburg, J., concurring)).

In the context of Title VII's prohibition[3] against discrimination, sex means "membership in a class delineated by gender." *DeCintio v. Westchester County Medical,* 807 F.2d 304, 306 (2nd Cir.1986); *see Hopkins v. Baltimore Gas & Elec. Co.,* 871 F.Supp. 822, 832 n. 17 (D.Md.1994). "[T]he plain meaning [of this Title VII phrase], implies that it is unlawful to discriminate against women because they are women and against men because they are men." *Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1085 (7th Cir.1984), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985). The

---

**2.** The other general category of sexual harassment, quid pro quo, is not alleged in this case. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987).

**3.** " 'Sex as a basis of discrimination was added as a floor amendment one day before the House approved Title VII, without prior hearing or debate.' " *Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1085 (7th Cir.1984) (quoting *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 662 (9th Cir., 1977)), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985). Finding no mean-

ingful legislative history on what Congress intended by "sex," courts have inferred from the other Title VII prohibited discriminatory motives that the Congress in 1964 intended "sex" to have the traditional meaning of a person's gender rather than a more expansive interpretation. *DeCintio v. Westchester County Medical,* 807 F.2d 304, 306 (2nd Cir.1986), *cert. denied,* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987); *Ulane v. Eastern Airlines, Inc.,* 742 F.2d at 1085; *Sommers v. Budget Marketing, Inc.,* 667 F.2d 748, 750 (8th Cir.1982).

courts have rejected efforts to read sexual orientation, preference, identity, affiliation or behavior into Title VII's prohibition of sex discrimination. *Hopkins,* 871 F.Supp. at 832 n. 17; *see, e.g., Williamson v. A.G. Edwards and Sons, Inc.,* 876 F.2d 69, 70 (8th Cir. 1989), *cert. denied,* 493 U.S. 1089, 110 S.Ct. 1158, 107 L.Ed.2d 1061 (1990) (homosexuality); *DeCintio,* 807 F.2d at 306–07 (sexual liaisons or attractions); *Ulane,* 742 F.2d at 1086–87 (transsexuality); *Sommers,* 667 F.2d at 750; (transsexuality); *James v. Ranch Mart Hardware, Inc.,* No. 94–2235–KHV, 1994 WL 731517, 1994 U.S. Dist. LEXIS 19102 (D.Kan. Dec. 23, 1994) (transsexuality).

■ On her hostile environment claim, Plakio alleges she was sexually harassed when ordered to perform perineal care on Jane Doe in a manner that sexually gratified Doe. Plakio can point to no direct evidence of an intent to discriminate on the basis of sex. The only inferences of discriminatory motive come from two circumstances. First, Plakio claims the harassment occurred because of her gender as evidenced by the fact that only female CNAs were hired to work the first floor. Plakio argues:

> The Defendant only hires female CNAs to work on the patient's floor. In fact, the Defendant employed male CNAs, but they did not work on the patients's floor. The presence of a male CNA was so rare at the Defendant's facility, that the witnesses were able to remember the one and only time a male CNA came to the first floor to assist during a staff shortage. The very fact that the Defendant hires only females to staff the first floor implicitly makes the conduct gender based.

(Dk. 92 at 11). Second, Plakio claims sexual harassment in that the perineal care performed on Jane Doe was allegedly sexual in nature. She argues: "The conduct complained of here constitutes sexual harassment in the most dramatic fashion. It is within the scope of Title VII to prevent an employer from forcing its employees to perform sexually gratifying acts on patients." (Dk. 92 at 11).

Plakio here cannot successfully rely on either circumstance to prove discriminatory intent. Plakio's statement of facts and attached exhibits do not match up with her allegations on the first circumstance. The law does not recognize the second circumstance as presumptively supporting in every case a reasonable inference of discrimination on the basis of gender.

Of Plakio's statement of facts, paragraph twenty-three is the only one that addresses gender of the CNAs on the medical one floor. It reads: "The Defendant only hired female employees to work on the medical one floor where Jane Doe was located. (Tammero dep. pg. 47)." Jewell Tammero, who had been a CNA at Brewster Place, testified in her deposition:

Q. Did both male and female CNAs at Brewster Place help and assist in perineal care of male and female patients or residents?

A. Yes. There were some residents at Brewster Place, there were some female residents that would object to males taking care of them, privacy issue, preference, what not. I really can't say. There were several that would not allow the males—several female residents that would not allow males to take care of them. However, I was not aware of any of the male residents that would not let the female CNAs take care of them.

Q. Were there both male and female CNAs that performed peri care on med one, the first floor?

A. I know for sure that there was one male CNA that worked every now and again on med one. Mainly—primarily they only wanted females on medical one floor.

Q. Why was that?

A. I don't know, but we rarely saw a man down there unless it was the administrator come strolling through. And medical two, which is where they keep their more debilitated—their more debilitated residents, they would use the male CNAs. The man that I would see occasionally that worked med one, he worked I think full time on the—I can't remember his name, on the—there was I think a male LPN they had as well on the second floor, med two.

(Tammero Dep. at 46–47). Tammero's testimony shows that both male and female CNAs performed perineal care. The CNAs assigned to the medical one floor, where Jane Doe was a resident, were typically women. On occasion, a male CNA also worked on first floor. Tammero did not know why women CNAs were more likely to work on first floor than second floor. In contrast to Plakio's statement of fact and arguments, Tammero did not testify that only female CNAs were hired for the first floor or that there was only one instance when a male CNA worked on the first floor.

■ What is critically important to Plakio's claim, yet not specifically supported by the proffered exhibits, is evidence that the objectionable work requirements were enforced or imposed disparately on the basis of sex. On a sexual harassment claim, the crucial inquiry is whether the alleged harasser treats one or more members of one gender any differently from members of the other gender. A plaintiff must prove that he or she would not have been harassed but for her sex. *Rabidue v. Osceola Refining Co.*, 805 F.2d at 620. "[I]nstances of complained of sexual conduct that prove equally offensive to male and female workers would not support a Title VII sexual harassment charge because both men and women were accorded like treatment." *Id.* (citations omitted).

The evidence of record shows that the CNAs, regardless of their gender, were asked to administer perineal care to those residents medically requiring it. It is true that Jane Doe resided on first floor and that the CNAs assigned to first floor were primarily women. Still, the record is devoid of evidence to suggest these two facts are related by anything more than coincidence. Plakio offers no evidence on the defendant's reasons for assigning women CNAs to first floor. There is nothing to indicate that Jane Doe's arrival was the defendant's reason for assigning women CNAs to first floor. Nor does the evidence suggest that the defendant knew of Jane Doe's unique perineal care needs and then transferred her to a floor where women CNAs typically worked. In that regard, Plakio does not even question the defendant's placement of Jane Doe on

first floor as inconsistent with Doe's general health condition. Plakio cites no testimony that Jane Doe insisted on women CNAs for her perineal care or that the defendant always assigned women CNAs to this particular duty. In short, there are no circumstances suggesting a discriminatory motive in the defendant's decision to assign women CNAs to first floor or to place Jane Doe on first floor. Moreover, the court cannot find any evidence to indicate that Plakio's gender was the reason her supervisors did not act on her complaints about the perineal care procedure.

The court has nothing from which to infer that the men CNAs assigned to other floors were held to different standards when it came to performing perineal care and meeting the specific needs of mentally alert residents. *See McCoy v. Johnson Controls World Services*, 878 F.Supp. at 232. Moreover, it is uncontroverted that some of the women CNAs assigned to the first floor, in particular those working the day shift, had refused to perform the particular perineal care procedure on Jane Doe and not been disciplined for their refusal. This strongly suggests that Plakio's gender was not a reason for the defendant's actions. In sum, the court considers the inference that Plakio wants drawn from the mere fact that women CNAs typically worked first floor as simply too weak to raise a genuine issue of fact regarding the defendant's intent to discriminate on the basis of sex. "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been victim of sex discrimination as a result of that environment." *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994).

■ Because the work requirement, that is, the perineal care, was allegedly sexual in nature, the plaintiff believes there is actionable sexual harassment. The difficulty confronting Plakio is that this circumstance does not fit the traditional definition of sex discrimination. Plakio's position ignores the inherent distinction between sexual harassment and gender discrimination that was recently discussed in detail:

There seems to be significant confusion regarding the distinctions between sexual harassment and gender discrimination. There is no law specifically outlawing sexual harassment. Sexual harassment is illegal because and only because it is a form of gender discrimination under Title VII. Sexual harassment is a subset of gender discrimination. The concept of sexual harassment is an acknowledgment that when a male employer requires a woman to submit to him sexually for a promotion, or creates a sexually hostile environment, he is discriminating against her on the basis of her gender. Gender discrimination is the root; absent a base in gender discrimination, there can be no actionable sexual harassment. One can most certainly be the victim of gender discrimination without being a victim of sexual harassment; however, the reverse is not true. One cannot be the victim of actionable sexual harassment if one is not a victim of gender discrimination.

. . . .

The words "sex" and "sexual" create definitional problems because they can mean either "relating to gender" or "relating to sexual/reproductive behavior." The two are not the same, but are certainly related and easily confused. Title VII only recognizes harassment based on the first meaning, although that frequently involves the second meaning. However, harassment which involves sexual behavior or has sexual behavior overtones (i.e., remarks, touching, display of pornographic pictures) but is not based on gender bias does not state a claim under Title VII.

*Vandeventer v. Wabash Natl. Corp.,* 887 F.Supp. 1178, 1180, 1181 (N.D.Ind.1995). Simply put, Title VII prohibits gender discrimination, and gender harassment is an actionable form of discrimination when the victim can prove it would not have occurred but for the victim's gender.

That an employee's duties may include objectionable acts of a sexual nature does not necessarily evidence an employer's discriminatory intent. Perineal care is a routine duty for CNAs regardless of their gender. Perineal care may be one of the most person-

ally intrusive aspects of nursing care for the patients. What keeps perineal care from devolving into conduct having sexual implications is more than anything else the patient's detached viewpoint and the caregiver's professional attitude. Under these circumstances, it is not a fair or reasonable inference that the defendant intends to discriminate on the basis of the CNA's gender simply because it knows the perineal care duties may involve sexual conduct. Plakio's second circumstance is not by itself a viable basis on which to bring a sexual harassment claim.

The two circumstances—the assignment of women CNAs to the first floor and the sexual nature of Jane Doe's perineal care—do not offer, individually or in combination, a sufficient basis from which a rational factfinder could infer a sexually discriminatory motive on the defendant's part. Brewster Place is entitled to summary judgment on the plaintiff's hostile-environment sexual-harassment claim.

## RETALIATION

▇▇▇▇ Title VII prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, the employee must prove: "(1) she engaged in a protected opposition to discrimination or participation in a proceeding arising out of the discrimination, (2) adverse action by the employer subsequent to the protected activity, and (3) a causal connection between the employee's activity and the adverse action." *Griffith v. State of Colo., Div. of Youth Services,* 17 F.3d 1323, 1331 (10th Cir.1994) (citation omitted). The employee's opposition may be protected even if the employer's challenged practice "does not actually violate Title VII." *Dey v. Colt Const. & Development Co.,* 28 F.3d 1446, 1457 (7th Cir.1994). It is enough that the employee have a reasonable good faith belief that the employer discriminated. *Dey,* 28 F.3d at 1458; *Henry v. Gehl Corp.,* 867 F.Supp. 960, 967 (D.Kan.1994); *Mitchell v. Visser,* 529 F.Supp. 1034, 1044 (D.Kan.1981). An informal complaint to management qualifies as protected activity. *Phelps v. Sears Roebuck and Co.,* No. 90–

4133, 1993 WL 523202, at *5, 1993 U.S. App. LEXIS 33587 at *14 (10th Cir. Dec. 15, 1993); *see Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2nd Cir.1990). An employee may prove a retaliatory animus with circumstantial evidence that other employees in similar situations were treated differently. *Arzate v. City of Topeka*, 884 F.Supp. 1494, 1503 (D.Kan.1995). Upon such proof, the analysis then follows the typical shifting burden scheme with the employer articulating a legitimate business reason for the discharge and the employee proving the employer's reason is pretextual. *Id.*

Brewster Place moves for summary judgment arguing that Plakio cannot prove a causal connection between her filing of a discrimination charge and her subsequent discharge. Brewster Place maintains that it followed the policy set out in the employee manual in requiring a physician's release from Plakio. According to Brewster Place, the employee manual requires a physician's release if the employee calls in sick and then is gone for four or more days. After Plakio did not arrive with a release and did not produce one on the next day of her work schedule, the Executive Director at Brewster Place gave Plakio another day to obtain one. The Executive Director did not discharge Plakio until she also failed to provide a release that next day. Brewster Place contends Plakio cannot show its stated reason for discharging her is pretextual.

■ Plakio grounds her retaliatory discharge claim on evidence that two of the four days she was gone were regularly scheduled days off, that other CNAs were not required to bring physician's releases after missing more than one day of work, and that the defendant did not use the progressive disciplinary procedures outlined in the employee manual. These arguments fail to sustain her claim.

Brewster Place's employee manual views an employee on sick leave as being absent from job duties. The court agrees with Plakio that an employee is not absent from job duties when taking his or her regularly scheduled days off. Even so, Plakio's supervisors and Brewster Place's administration retained the discretion under the sick leave

policy to require a physician's release because Plakio had been absent from job duties for two days. Consequently, Brewster Place did not depart from its employee policies in its treatment of Plakio.

The plaintiff next argues that Brewster Place did not similarly enforce this policy against other CNAs taking sick leave. The only evidence the plaintiff offers in support of this argument comes from the deposition of Ms. Tammero, another CNA at Brewster Place. Ms. Tammero testified that she had "missed more than one day of work at a time" without being required to bring a doctor's note before returning to work. From this limited testimony, the court cannot determine whether Ms. Tammero's situation was similar to the plaintiff's. Ms. Tammero did not testify to ever being away from work for four straight days with at least two of the days on sick leave. As reflected in Brewster Place's policy, a nursing facility has reason for more concern about communicable diseases when an employee's illness causes an absence of four or more days. In Plakio's situation, her supervisors knew that she had been gone for four days and had called in sick two of the days. From the viewpoint of someone concerned about spreading communicable diseases in a nursing facility, such circumstances would create a question whether Plakio's illness was serious enough to have kept her from working all four days. To require a physician's release in these circumstances hardly seems unreasonable. More importantly, the given reasons for requiring a release from Plakio are not so tenuous as to suggest that Brewster Place may have had a different motive for its request.

The plaintiff maintains the employee manual at Brewster Place "carefully outlines the disciplinary procedure" and "calls for progressive discipline that includes a verbal warning and a written warning before an employee will be discharged for failing to provide notification of the illness or failing to provide a doctor's note." (Dk. 92 at 13). The plaintiff, however, does not submit any portion of the employee manual that outlines a progressive disciplinary procedure or that specifies the range of possible disciplinary

measures taken for not providing a physician's release. The plaintiff says that she did not refuse to provide a release but told the defendant that she had not seen a physician for her illness. The plaintiff adds that she "did not have enough money to pay for a doctor's care." (Dk. 92 at 13). The plaintiff does not cite any deposition testimony or offer any statement of fact in support of these arguments. In summary judgment proceedings, mere allegations will not substitute for evidence.

From the facts as presented in the record, Brewster Place's officials had reasonable grounds for requesting a physician's release from Plakio. They told her twice to obtain a physician's release. The Executive Director even gave Plakio an extra day to obtain one. The time and expense necessary to obtain a physician's release for work can hardly be considered excessive. These circumstances do not suggest that Plakio's termination was without cause, was handled unfairly, or was due to an unreasonable enforcement of policy. The plaintiff comes forth with no evidence of another employee refusing to provide a physician's release and not being terminated. Plakio's arguments do not present a factual basis for reasonably inferring another motive behind Brewster Place's decision to terminate her. Brewster Place is entitled to summary judgment on the plaintiff's retaliatory discharge claim.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 89) is granted, and costs shall be allowed to the defendant pursuant to Fed. R.Civ.P. 54(d).