**Cecelia L. RETTIGER, Plaintiff,**

v.

**IBP, INC., Defendant.**

**No. 96–4105–SAC.**

United States District Court,
D. Kansas.

Sept. 15, 1997.

Pantaleon Folrez, Jr., Florez & Frost, P.A., Topeka, KS, for Plaintiff.

Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, Topeka, KS, Donald S. Lee, c/o Song Ping Lee, Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This employment discrimination case comes before the court on the defendant's motion for summary judgment. (Dk.29). The plaintiff, Cecelia Rettiger ("Rettiger"), brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, alleging sexual harassment claims of hostile work environment and quid pro quo discrimination and a retaliation claim based on adverse actions taken after her complaints of sexual harassment. The defendant IBP, Inc. ("IBP") argues it is entitled to summary judgment as the plaintiff cannot prove respondeat superior liability for the hostile work environment claim and cannot prove critical elements to her quid pro quo and retaliation claims. The plaintiff opposes summary judgment on all claims and arguments.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple

showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355; it requires "'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.'" *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir. 1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

Summary judgments are "used sparingly in employment discrimination cases." *Hardin v. Hussmann Corp.,* 45 F.3d 262, 264 (8th Cir.1995). This is because discrimination claims often turn on the employer's intent, *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370–71 (7th Cir.1992), and courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 530 (10th Cir.1994). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.,* 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds, McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Thus, if the plaintiff's evidence fails to create any reasonable doubts about the employer's expressed lawful motive for taking the adverse employment action, summary judgment is proper. *Cone,* 14 F.3d at 530.

Though its normal practice is to set out all relevant uncontroverted facts, the court will dispense with that practice here. The defendant's motion focuses on several limited issues which can be discussed and decided without a full factual context. In an effort to save the time and expense of the court and parties, the court will simply summarize the relevant factual setting.

The defendant IBP maintains a facility in Emporia, Kansas, where it processes beef and pork. The plaintiff Rettiger was hired as a temporary, on-call chemist at IBP's Emporia facility on February 17, 1992. She worked there while attending Emporia State University as a full-time student. Rettiger's last day of work with IBP was on January 15, 1993.

Throughout the plaintiff's employment, Jennifer Bennett was the senior chemist and laboratory manager at the IBP's Emporia facility. As manager of the laboratory, Bennett supervised the plaintiff's work, interviewed and hired applicants for the laboratory, fired laboratory employees, increased or decreased laboratory employees' hours of work, and determined the amount and type of laboratory employee training. Bennett had interviewed the plaintiff and decided to hire her as a temporary on-call chemist in February of 1992.

During the plaintiff's employment, Dan Hutton worked in the laboratory as a chemist 1. Bennett testified that part of Hutton's duties included serving as the "supervising chemist" and "making sure" that the other laboratory employees "got their work done." (Bennett Dep., p. 25). The only other full-time employee in the laboratory was the junior chemist, Teresa Walford, who typically worked from 7:00 a.m. to 3:30 p.m.

Between October 7, 1992, and January 4, 1993, Bennett took a maternity leave of absence. During Bennett's absence, Hutton assumed some of Bennett's responsibilities as manager of the laboratory. According to

Bennett, Hutton "only did the things that needed to be done while . . . [she] was gone." (Bennett Dep. p. 24). According to Hutton, he did not consider himself in charge of the laboratory and only carried out Bennett's duties in generating daily analysis and reports, keeping up the paperwork, and answering the telephone. (Hutton Dep. p. 30–31). According to Walford, Hutton was in charge of the laboratory while Bennett was gone. (Walford Dep. p. 21). He "ran the lab" and supervised both Walford's work and the plaintiff Rettiger's work. (Walford Dep. p. 22). According to Rettiger, she hardly spoke to Bennett and Hutton was basically her supervisor. The plaintiff testified to occasions where Hutton either required her to work late or sent her home early.

In October of 1992, Rettiger confided in Walford that Hutton had been sexually harassing her for some time. The plaintiff said that Hutton wanted her to sleep with him, that Hutton had told her that he was attracted to her, that Hutton had kissed her, and that Hutton did not want to teach her other laboratory procedures unless she became "involved with him." (Walford Dep. pp. 13–14). Walford advised the plaintiff to report her complaints and to try to catch one of the incidents on a tape recorder.

Rettiger did not report the sexual harassment until December 8, 1992, when she went to Bennett's house and told Bennett of the sexual harassment. In part, the plaintiff told Bennett that Hutton had promised her more overtime hours if she would become closer with him. Bennett told the plaintiff to confront Hutton and warn him that the plaintiff would report him if the harassment continued. The plaintiff informed Bennett that she had already told Hutton that she was not interested in him. Bennett said she would call the personnel department to determine what more needed to be done. Later that same day, the plaintiff took her complaints of sexual harassment to the personnel department.

As part of the personnel department's investigation, written statements were collected from the employees. The plaintiff wrote that Hutton had complimented her appearance and told her of his attraction towards her; that Hutton had grabbed her and kissed her; that Hutton had placed his hands on her buttocks, legs, hands, and back; that Hutton had made sexually suggestive comments and had asked explicit sexual questions; that Hutton had stared at her; and that he had offered to teach her additional laboratory tests if she would have sex with him. The plaintiff also wrote that these events occurred when she and Hutton were the only ones working in the lab or that comments were made out of Walford's presence. The plaintiff wrote that Hutton made these sexual advances when she was scheduled or had been asked to work late with Hutton. In his written statement, Hutton denied all of these charges.

From its investigation, the personnel manager, Rodger Brownrigg, believed "there was not enough substantial evidence to show the allegations to be true or false." (Dk.30, Ex. 11). The investigation did not reveal any witnesses of Hutton sexually harassing the plaintiff, nor did it find any other employees with reports or complaints about sexual harassment by Hutton. Brownrigg verbally warned Hutton that sexual harassment would not be tolerated and that future incidents could result in termination. Brownrigg also directed Hutton to speak to the plaintiff only when Walford was present. Brownrigg advised the plaintiff to report any further problems.

After making her original charges, the plaintiff followed up with a separate complaint to Brownrigg that Hutton was leaving her notes about her daily routine work assignments. Brownrigg directed Hutton to leave notes only to notify the plaintiff of changes in her routine work assignments. The plaintiff testified that after she complained to management about the sexual harassment Hutton treated her differently. He did not speak to her, he changed her work duties, and he made an exaggerated point of keeping his distance.

Sometime during the week of January 16, 1993, Bennett notified the plaintiff that the laboratory did not have sufficient work to keep the plaintiff as a part-time employee and that she would return to work only if called back. Bennett also told the plaintiff

that she would be left in the payroll system in the event that the laboratory's workload changed significantly. Bennett advised her to check with the personnel department about other available part-time employment.

The hours that had been scheduled for the plaintiff to work in January were given to Walford and Hutton, both of whom worked more hours that month than in either of the prior two months. The laboratory's efficiency ratings for the first quarter of 1993 improved from the last quarter of 1992. There, however, also was approximately a 14% increase in the total number of tests and total test time in the first quarter of 1993. Bennett testified that from 1992 through 1994 the average number of laboratory tests remained about the same.

## SEXUAL HARASSMENT

■ Under Title VII, sexual harassment can be established under one of two general theories: hostile work environment and quid pro quo discrimination. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). The plaintiff asserts both theories in this case. "A hostile work environment exists when a plaintiff is subjected to sexual harassment 'sufficiently severe or pervasive "to alter the conditions of the victim's employment and create an abusive working environment."'" *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1000 (10th Cir.1996) (quoting *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (citation omitted)). "[Q]uid pro quo harassment occurs 'where specific benefits of employment are conditioned on sexual demands' by the victim's supervisor." *Harrison v. Eddy Potash,Inc.,* 112 F.3d 1437, 1443 (10th Cir.1997) (quoting *Ball v. Renner,* 54 F.3d 664, 665 n. 2 (10th Cir.1995)), *petition for cert. filed,* 66 U.S.L.W. 3137 (Aug. 6, 1997) (No. 97–232).

### HOSTILE WORK ENVIRONMENT

■ For this claim, the plaintiff alleges that Hutton repeatedly tried to pressure her into a sexual or romantic relationship with him. After Bennett went on maternity leave, the plaintiff alleges that Hutton intensified his sexual advances and physically touched her on occasion. Despite her repeated rejec-

tions, Hutton allegedly continued to make unwelcome sexual advances.

To establish such a claim, the plaintiff must prove the following elements:

(1) she is a member of a protected group;

(2) she was subject to unwelcome harassment;

(3) the harassment was based on sex; and

(4) the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

*Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 797 (10th Cir.1997) (citation omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 342, 139 L.Ed.2d 266 (1997). For purposes of this motion, the defendant concedes that a genuine issue of material fact exists as to each of these elements. The defendant argues, however, that the plaintiff is unable to prove any of the recognized circumstances for imposing employer liability on hostile work environment claims.

The Tenth Circuit recently summarized the agency principles applicable in hostile work environment claims:

1) The supervisor committed the harassment while acting in the scope of his employment. *See* Restatement (Second) of Agency § 219(1). (As previously indicated, this will rarely be a basis for employer liability.)

2) The employer knew about, or should have known about, the harassment and failed to respond in a reasonable manner. *See* Restatement (Second) of Agency § 219(2)(b).

3) If the employer manifested in the supervisor the authority to act on its behalf, such manifestation resulted in harm to the plaintiff, and the plaintiff acted or relied on the apparent authority in some way. *See* Restatement (Second) of Agency § 219(2)(d), clause 1.

4) If the employer delegated the authority to the supervisor to control the plaintiff's work environment and the supervisor abused that delegated authority by using that authority to aid or facilitate his perpetration of the harassment.

*See* Restatement (Second) of Agency § 219(2)(d), clause 2.

*Harrison v. Eddy Potash, Inc.*, 112 F.3d at 1446. The defendant argues it promptly and effectively remedied any alleged harassment once the plaintiff reported her complaints "to management-level personnel." (Dk.30, p. 19). As for the latter two possible conditions of liability, the defendant argues that Bennett, not Hutton, was the plaintiff's supervisor and that Hutton did not have the authority to affect the terms and conditions of the plaintiff's employment. Citing *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993), *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989), *vacated in part on other grounds,* 900 F.2d 27 (4th Cir.1990), and *Rushing v. United Airlines*, 919 F.Supp. 1101 (N.D.Ill.1996), the defendant insists employer liability depends on the supervisor having the agency authority to control the hiring, firing or conditions of the plaintiff's employment.

■ The Tenth Circuit recently rejected the interpretation of *Sauers* now argued by the defendant:

First, the above-quoted language from *Sauers* arose solely in the context of deciding whether the employer (Salt Lake County) had been timely sued. Thus, the "requirement" that the harasser "serve[ ] in a supervisory position and exercise[ ] significant control over the plaintiff's hiring, firing or conditions of employment," applies only when deciding whether the filing of a suit against a harasser (in his official capacity) can operate as a suit against the employer.

Second, there is nothing in the language of Title VII or Restatement of Agency that limits the liability of an employer to harassment perpetrated by an employee who "serve[d] in a supervisory position and exercise[d] significant control over the plaintiff's hiring, firing or conditions of employment."...

Third, application of the *Sauers* definition of "agent," taken to its extreme, would have the illogical result of shielding employers from liability for harassment committed by low-level employees....

For all of these reasons, we conclude the discussion in *Sauers* of who constitutes an "agent" for Title VII purposes is strictly limited to situations in which a court is determining whether a claim against a named individual defendant (in his official capacity) can operate as a claim against the employer itself. Where, as here, plaintiff has properly sought Title VII relief against her employer, the "agent" definition in *Sauers* simply has no applicability in deciding whether the employer is liable for the conduct of its employees.

*Harrison v. Eddy Potash, Inc.*, 112 F.3d at 1447–48. Thus, an employer may be liable even if the harasser is a low-level supervisor who lacks significant control over the plaintiff's hiring, firing or conditions of employment.

■ The court in *Harrison* also clarified that it would follow the interpretation of clause 2 liability under Restatement (Second) of Agency § 219(2)(d) used in *Karibian v. Columbia University*, 14 F.3d 773, 780 (2nd Cir.), *cert denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994):

As previously described, the *Karibian* interpretation allows an employer to be held liable, even if a sexual harassment policy is in place and is made known to plaintiff, where the supervisor uses his actual or apparent authority to aid or facilitate his perpetration of the harassment. We emphasize, however, that this interpretation does not allow liability to attach where the harasser's agency relationship merely provided him proximity to plaintiff. (citation omitted).

112 F.3d at 1446. Thus, if the harasser holds actual power over the plaintiff in the work place, then the employer is liable if the harasser misuses that power to create a hostile work environment for the plaintiff.

The court finds that a genuine issue of material fact exists whether Hutton had supervisory authority, actual or apparent, over the plaintiff which aided him in accomplishing the alleged harassment. The laboratory manager, Jennifer Bennett, testified that Hutton was the "supervising chemist" with the responsibility of "making sure" that Walford and the plaintiff "got their work done."

(Bennett Dep., p. 25). Walford testified that Hutton was in charge while Bennett was on maternity leave. The plaintiff testified that Hutton had required her to work late so that he and the plaintiff would be the only ones working in the laboratory. According to the plaintiff, Hutton supervised her, criticized her work, and changed her work duties. A reasonable jury hearing this and the other testimony summarized earlier could find that Hutton was in a position with actual or apparent authority over the plaintiff that he misused to create a hostile working environment. The court denies the defendant's motion for summary judgment on the plaintiff's hostile environment claim.

### QUID PRO QUO

■ "To prevail on a quid pro quo discrimination claim, the plaintiff must show that concrete employment benefits were conditioned on submission to sexual conduct." *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d at 1416 (citation omitted). The plaintiff must establish: "(1) that her supervisor had authority to materially alter the terms and conditions of plaintiff's employment; (2) that her supervisor demanded sexual favors; and (3) that plaintiff's rejection of her supervisor's sexual demands resulted in a job detriment." *Huddleston v. Lumbermens Mut. Cas. Co.*, 942 F.Supp. 504, 509 (D.Kan.1996) (citing *Starrett v. Wadley*, 876 F.2d 808, 820 (10th Cir.1989)). "In cases involving quid pro quo harassment, courts routinely hold, with little or no discussion, that the employer is 'strictly liable' for the supervisor's wrongful conduct." *Harrison*, 112 F.3d at 1443 (citations omitted); *see Karibian v. Columbia University*, 14 F.3d at 777 ("Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer for quid *pro quo* harassment."). The Tenth Circuit in *Harrison* explained this "strict liability" as an implied finding that the employer was liable under one of three conditions in the Restatement:

> Presumably, this imposition of "strict liability" rests upon the fact that the supervisor was acting within the scope of his

actual or apparent authority when he committed the harassment, *see* Restatement (Second) of Agency § 219(1) and (2)(d) (1958), or because the supervisor "was aided in accomplishing the [harassment] by the existence of the agency relation." *Id.* § 219(2)(d).

112 F.3d at 1443.

The defendant first argues it is not liable, because Hutton was not the plaintiff's supervisor. For the same reasons discussed under the hostile work environment claim, the court finds summary judgment inappropriate based on the genuine issues of material fact concerning whether Hutton had actual and apparent supervisory authority over the plaintiff that aided him in accomplishing the harassment.

■ The defendant's other argument is that the plaintiff suffered no tangible detriment to her employment as a consequence of refusing Hutton's alleged sexual advances. For this argument, the defendant relies largely on the premise that only Bennett had the authority to alter the terms and conditions of the plaintiff's employment. The plaintiff responds that Hutton offered her training on additional laboratory tests and procedures in exchange for sexual relations. There is evidence from which a reasonable jury could find that Hutton believed he had the authority to conduct this training and communicated the same to the plaintiff. The plaintiff says she never received this training. The plaintiff also complains that Hutton promised the plaintiff more overtime hours if she became closer to him. There is evidence from which a reasonable jury could find that Hutton had the actual or apparent authority to offer overtime hours to the plaintiff and to adjust her time records. Finally, the plaintiff has testified that after she rejected Hutton's sexual advances he became unduly critical of her work, assigned her less desirable work, sent her home one day after working only one hour, and reduced her scheduled hours. While the defendant remains adamant that all of these matters were solely within Bennett's authority, the evidence of record shows that Bennett did not exercise that authority exclusively, particularly while she was on maternity leave, and that on one

or more occasions Hutton either directly exercised that authority or was indirectly involved in the exercise of that authority. Consequently, the court believes there to be genuine issues of material fact concerning whether the plaintiff suffered a job detriment as a result of rejecting Hutton's alleged sexual advances.

## RETALIATION

Section 2000e–3(a) of Title VII provides in relevant part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ..., because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge ... under this subchapter.

The general *McDonnell–Douglas* burden-shifting approach used in Title VII discrimination suits also operates in Title VII retaliation suits. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir.1996); *Sorensen v. City of Aurora*, 984 F.2d 349, 353 (10th Cir. 1993).

To establish a prima facie case of retaliation, the plaintiff must show: (1) she engaged in protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the defendant employer subsequent to or contemporaneous with the plaintiff's protected activity; and (3) a causal connection between the protected activity and the employer's adverse action. *Berry*, 74 F.3d at 985; *Griffith v. State of Colo., Div. of Youth Services*, 17 F.3d 1323, 1331 (10th Cir.1994). Informal complaints to management qualify as protected activity. *Huddleston v. Lumbermens Mut. Cas. Co.*, 942 F.Supp. at 511. The plaintiff's opposition is protected even if the plaintiff was not successful in prosecuting her original discrimination charge, *Archuleta v. Colorado Dept. of Institutions*, 936 F.2d 483, 487 (10th Cir.1991), and even if the defendant's practice did "not actually violate Title VII," *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1457 (7th Cir.1994). It is enough that the plaintiff had a reasonable good faith belief that the employer discriminated. *Dey*, 28 F.3d at *1457*; *Plakio v. Congregational*

*Home, Inc.*, 902 F.Supp. 1383, 1392 (D.Kan. 1995). The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. *Burrus v. United Telephone Co.*, 683 F.2d 339, 343 (10th Cir.), *cert denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). While at the same time rejecting efforts to expand the required temporal proximity, the Tenth Circuit will not apply this requirement "too restrictively where the pattern of retaliatory conduct begins soon after the filing of the.. complaint." *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir.), *cert.denied*, — U.S. —, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996).

According to the defendant, the plaintiff alleges that among the adverse actions she suffered in retaliation was the assignment of less desirable tasks, such as washing test tubes. The defendant argues that these tasks were already part of her job duties and that the assignment of these duties does not constitute an adverse job action. The plaintiff does not respond to this argument. The court, therefore, grants this part of the defendant's motion insofar as it is uncontested.

The other alleged adverse actions are that the plaintiff's hours were reduced and then her position was eliminated in January of 1993. The defendant argues that the plaintiff is unable to prove a causal connection between her complaints and these employment actions. The defendant asserts "[t]he overriding cause for the reduction in plaintiff's hours and her ultimate dismissal was the lack of available work in the laboratory." (Dk.30, p. 30). The defendant rated the efficiency of its laboratory by calculating a ratio based on total test times and total employee hours. The defendant argues that its goal was a 90% efficiency and that it reduced the plaintiff's hours whenever the ratios were poor and eventually dismissed the plaintiff because of these poor ratings:

In June and July of 1992, the laboratory efficiency ratings were very poor, registering at 66.8% and 62.5%. As a result, Bennett reduced plaintiff's hours for the first time at the end of July 1992 from approximately twenty (20) hours to about fifteen

(15) hours per week. This resulted in a large increase in the August efficiency rating, up to 79.1% The laboratory's efficiency rating declined in September 1992 to 72.2%, prompting Bennett again, at the end of September, to reduce plaintiff's hours from fifteen (15) to about ten (10) hours per week. Bennett maintained plaintiff's hours at approximately ten per week until notifying plaintiff in mid-January 1993 that there were insufficient work in the laboratory. All of the earlier reductions in hours occurred *before* plaintiff's report of alleged sexual harassment to Bennett and defendant's personnel office on December 8, 1992. . . .

Bennett's rationale for reducing plaintiff's hours and for ultimately dismissing her in January 1993 was that the laboratory efficiency ratings were too low and there was not enough work available for Bennett, two full-time chemists, and a part-time on-call employee. The number of tests conducted in the laboratory declined steadily from October through December 1992. After plaintiff was told that she did not have to return to the laboratory, laboratory efficiency ratings increased dramatically from January through April 1993, between 78% and 92.4% ratings. Defendant also did not hire new or additional help in the laboratory until November 28, 1994, almost two years after plaintiff last worked in the lab.

(Dk.30, pp. 32–33). Based on these arguments, the defendant believes it is entitled to summary judgment on the plaintiff's retaliation claim.

The court believes the plaintiff has presented prima facie proof of a causal connection between her complaint and the reduction of hours and eventual dismissal. During the three-week period before lodging her complaint with management, the plaintiff worked an average of almost eighteen hours per week. During the three-week period after her complaint, the plaintiff worked less than twelve hours per week. As stated before, there is also a question of material fact concerning whether Hutton exercised authority over the number of hours that the plaintiff actually worked while Bennett was on mater-

nity leave. Less than six weeks after the plaintiff's complaint, the defendant decided that it lacked the work to keep the plaintiff employed on a regular basis. The temporal proximity between these events is close enough that one could reasonably infer a causal connection. See *Marx v. Schnuck Markets, Inc.*, 76 F.3d at 329 ("[P]rotected conduct closely followed by adverse action may justify an inference of retaliatory motive." (citation omitted)).

■ The plaintiff has come forth with evidence from which a reasonable jury could find that the defendant's reliance on the efficiency ratings is a pretext for ·retaliation. The defendant argues that poor efficiency ratings prompted Bennett at the end of September, to reduce plaintiff's hours again from fifteen to about ten hours per week and that plaintiff continued to average ten hours until her dismissal. The time records attached to the plaintiff's brief do not substantiate the defendant's position. Following the reduction of hours in late September, the plaintiff averaged nearly nineteen hours a week until she complained to management about the sexual harassment. It was during this same period that Bennett was on maternity leave, and both Hutton and Walford also averaged more hours per week than for similar periods prior to and after Bennett's maternity leave. From October through December of 1992, total test hours declined less than six hours but total employee hours increased by almost forty hours. From these records, one could infer that the defendant's efficiency rating problems were due to management problems and not any serious decline in work. The plaintiff also points out that the defendant's test hours over the first quarter of 1993 increased substantially more than the decline noted by the defendant in the last quarter of 1992. The court will let the jury decide what the defendant's motive was in reducing the plaintiff's hours and in dismissing her.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk.29) is granted on that part of the plaintiff's Title VII retaliation claim in which she alleges the assignment of less desirable tasks was an adverse employment action, and is

otherwise denied on the remaining claims and issues.