BACCHUS INDUSTRIES,
INC., Appellant,

v.

ARVIN INDUSTRIES, INC., Appellee.

No. 89–2288.

United States Court of Appeals,
Tenth Circuit.

June 19, 1991.

Rehearing Denied July 30, 1991.

**889**

Sam Snoddy, El Paso, Tex., for appellant Bacchus Industries, Inc.

Daniel J. McAuliffe (James R. Condo, Nancy A. Stratta and Eileen J. Moore, with him on the brief), for appellee Arvin Industries, Inc.

Before MOORE and BALDOCK, Circuit Judges, and ANDERSON,[*] District Judge.

ALDON J. ANDERSON, Senior District Judge.

Bacchus Industries, Inc., ("Bacchus") appeals the judgment of the district court in its action against Arvin Industries, Inc. ("Arvin"). Bacchus appeals from two separate decisions of the district court. Initially, it is claimed that the district court improperly granted summary judgment in favor of Arvin on Bacchus' claims under 18 U.S.C. §§ 1961–68 ("RICO") and on several pendent common law claims. Bacchus also claims that the district court erred in granting Arvin's motion for a directed verdict on two claims under 15 U.S.C. §§ 1 & 2 ("Sherman Antitrust Act").

## I. Facts

Bacchus and Arvin are competing manufacturers of evaporative coolers. Arvin entered the market in 1982 when it purchased the International Metals Products Division of McGraw–Edison, and created the ArvinAir division in order to manufacture evaporative coolers. R.Doc. 91, p. 5, ¶ 4. Bacchus is a small company which was organized and is currently managed by members of the Bacchus family. Tr.Vol. 2, pp. 303–307. One major difference between the coolers manufactured by Arvin and the coolers manufactured by Bacchus is in the construction of the cabinets. Arvin's coolers have traditional square cabinets constructed of metal while the Bacchus cooler cabinet is round and constructed of fiberglass. Both coolers use an aspen pad as the cooling medium.

During 1983 and 1984, the Bacchus cooler received a certain amount of negative publicity. Bacchus claims that Arvin engaged in prohibited conduct in order to depict the Bacchus cooler as a fire hazard. Bacchus asserts that Arvin destroyed the product reputation of the Bacchus cooler in order to eliminate Bacchus as a competitor. Bacchus makes broad, general allegations but appears to base its claims on the following incidents.

On June 3, 1983, Bacchus suffered a major fire at its New Mexico plant. On June 7, 1983, Mr. Richard D. Fife, Arvin's vice president of marketing, sent a memo to Arvin's western area sales representatives informing them of the fire. Attached to the memo was a newspaper article describing the firefighters' difficulty in controlling the blaze and noting that "the fire spread fast because fiberglass is very flammable." Fife's memo transmitting the article stated: "The article identifies one of the major problems with fiberglass and/or plastic coolers. They are very flammable and emit toxic fumes which are deadly." R.Doc. 103, exb. 17.

In August, 1983, Arvin conducted a controlled burn test of evaporative coolers at Arvin's Phoenix plant ("the Phoenix Burn Test"). Evaporative coolers manufactured by Arvin, Bacchus, and a third manufacturer, Tradewinds, were ignited and then observed as they burned. The Bacchus cooler was constructed of fiberglass, the Tradewinds cooler of plastic, and the Arvin cooler of metal. Each of the three coolers used the same aspen cooling medium. A video-

[*] The Honorable Aldon J. Anderson, Senior United States District Judge for the District of Utah, sitting by designation.

tape of the Phoenix Burn Test shows that the Bacchus cooler burned more rapidly and more spectacularly than the Arvin cooler. Tr.Vol. 3, p. 499. Videotapes and still photographs of the Phoenix Burn Test were distributed to Arvin sales representatives and used on a limited basis as a sales tool. Tr.Vol. 1, p. 163.

On April 25, 1984, Fife sent another memo to Arvin's western area sales representatives advising them of a newspaper article from the El Paso Times entitled "Housing's coolers called fire hazards." The article reported that the Bacchus cooler could pose a fire hazard and detailed the results of the El Paso Housing Authority Board's own burn test of a Bacchus cooler and a Tradewinds cooler. The article noted "the toxicity of fumes from the blaze and the speed of the fire on the Bacchus model." R.Doc. 103, exb. 18.

On May 3, 1984, Wayne Coggins, the Odessa, Texas Fire Marshall, conducted an independent burn test of evaporative coolers manufactured by Arvin, Bacchus and Tradewinds ("the Odessa Burn Test"). Coggins conducted the test to determine whether fiberglass and plastic coolers would create a fire hazard if they were involved in a fire or whether they were any danger to roofs once they caught on fire. R.Doc. 91, ¶¶ 23–24. An Arvin distributor supplied the evaporative coolers to Mr. Coggins who directed his firemen to remove the coolers from the packing cartons and to set the coolers up on concrete blocks. Tr.Vol. 2, p. 261. Each cooler was ignited in the same manner and then observed as it burned. The videotape of the test shows that while all three coolers were inflammable, the non-metallic coolers manufactured by Bacchus and Tradewinds burned more rapidly and more spectacularly than the metallic cooler manufactured by Arvin. The Odessa Burn Test was videotaped by three local television stations. Tr. Vol. 2, p. 281.

By letter dated May 10, 1984, Bacchus asked Arvin for permission to review the Phoenix Burn tape "to check its accuracy." R.Doc. 103, exb. 13. Arvin's in-house coun-

sel responded by letter dated June 12, 1984 as follows:

Please be advised that, in the regular course of its business, ArvinAir conducts tests of its products and those of its competitors, and in one instance, a test of inflammability was videotaped. In addition, we are advised that certain members of the electronic media have also videotaped such demonstrations.

Although I am assured that precautions were taken not to distort the characteristics of our competitors' products as well as our own, in order to avoid any further misunderstanding in this regard, we have requested that any copies of our tape which may exist outside of the ArvinAir organization be returned to us. Henceforth, these test depictions will be used by my client solely for purposes of its own internal examination.

You will please understand that this retrieval does not, and cannot, extend to recordings of similar tests which may have been conducted by those outside of the employ of Arvin Industries, over whom my client has no control.

R.Doc. 103, exb. 14.

By memo dated June 11, 1984, Fife again contacted Arvin's western area sales representatives and informed them that Arvin had agreed to discontinue showing the Phoenix Burn Tape. Fife asked the representatives to discreetly recover any tapes from distributors without discussing the reason for the return. R.Doc. 103, exb. 19; Tr.Vol. 1, pp. 163–166.

## II. Procedural History

Bacchus sued Arvin alleging violations of 18 U.S.C. §§ 1961–68 (RICO); 15 U.S.C. § 1 and § 2 (Sherman Antitrust Act); 15 U.S.C. § 13 (Clayton Antitrust Act); 15 U.S.C. § 1125 (Lanham Act) and state law claims for conspiracy to defraud and commercial disparagement. R.Doc. 57.

The trial court granted summary judgment in favor of Arvin on all of Bacchus' claims except the § 2 Sherman Antitrust Act claim which was allowed to proceed to trial. R.Doc. 170. At trial, Bacchus claimed that Arvin violated § 2 of the Sher-

man Antitrust Act by attempting to monopolize and/or conspiring to monopolize the residential evaporative cooler market. At the conclusion of the case presented by Bacchus, Arvin moved for and was granted a directed verdict. Tr.Vol. 5, p. 856. Bacchus appeals both the grant by the district court of Arvin's motion for summary judgment and the grant of Arvin's motion for a directed verdict.

### III. Analysis

#### A. Summary Judgment

■ Because summary judgment involves purely legal determinations, we review the district court's decision to grant summary judgment *de novo*. *Carey v. United States Postal Service*, 812 F.2d 621, 623 (10th Cir.1987); *Morgan v. Mobil Oil Corp.*, 726 F.2d 1474, 1477 (10th Cir. 1984).

■ Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact. The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor. *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir.1991). The nonmoving party "may not rest upon the mere allegations or denials of his pleadings" to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

#### 1. The RICO Claims

Bacchus claims that the district court erred in granting summary judgment in favor of Arvin on two separate RICO claims. In Count IV of its amended complaint, Bacchus alleges that Arvin partici-

pated in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Count V of the amended complaint maintains that Arvin conspired with its agents, employees, manufacturer's representatives and distributors to conduct an illegal racketeering enterprise through a pattern of racketeering activities in violation of 18 U.S.C. § 1962(d). R. Doc. 57, pp. 7–9.

To state a cause of action under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co. Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Any person found in a private civil action to have violated RICO is liable for treble damages, costs, and attorney's fees. § 1964(c).

■ Bacchus' RICO claim fails because Bacchus has failed to properly allege a pattern of racketeering activity. A "pattern" by definition requires at least two acts of "racketeering activity" within a ten-year period. § 1961(5). "Racketeering activity" is defined to include mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). 18 U.S.C. § 1961(1). These acts of racketeering activity are often referred to as "predicate acts" because they form the basis for liability under RICO.

■ However, a pattern of racketeering activity is not established merely by proving two predicate acts. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 236, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). Rather, "[t]o establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *Id.* 109 S.Ct. at 2901 (emphasis in original).

Thus, to properly allege a pattern of racketeering activity as required by RICO, Bacchus must identify a minimum of two instances of racketeering activity as defined in § 1961(1) which amount to, or otherwise constitute a threat of continuing racketeering activity by the enterprise. Bacchus claims that Arvin committed nu-

merous acts of mail fraud and wire fraud by communicating, through the mail and by telephone, with Arvin sales representatives and with Bacchus. Bacchus claims that Arvin intentionally misrepresented the Bacchus cooler as a fire hazard through its memoranda and by distributing the Phoenix Test Burn tape. Bacchus also claims that Arvin made fraudulent misrepresentations in Arvin's June 12, 1984 letter to Bacchus in which Arvin agreed to withdraw the Phoenix Test Burn tape.

■ In order to state a claim of mail fraud under 18 U.S.C. § 1341, Bacchus must allege (1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme. *United States v. Warren*, 747 F.2d 1339, 1344 (10th Cir.1984). The elements of wire fraud under 18 U.S.C. § 1343 are similar but require that the defendant use interstate wire, radio or television communications in furtherance of the scheme to defraud. *See* 18 U.S.C. § 1343 (1988).

■ Actionable fraud in turn consists of (1) the misrepresentation of a fact, (2) known to be untrue by the maker, (3) made with an intent to deceive and to induce the other party to act in reliance thereon to his detriment. *Cargill v. Sherrod*, 96 N.M. 431, 631 P.2d 726, 727 (1981).

We find that the district court properly granted summary judgment in favor of Arvin on the § 1962(c) claim because Bacchus failed to state adequately a claim for fraud, including mail fraud and wire fraud. We also find that the evidence suggests that Arvin sent the memoranda and the Phoenix Test Burn tape to its sales representatives in order to provide them with information on a competitor's product and not to deceive or to induce detrimental reliance. While Bacchus disputes the veracity of the claim that Bacchus coolers might pose a fire hazard, the mere transmittal of the information to the sales representatives was not fraudulent. Similarly, the June 12, 1984 letter from Arvin to Bacchus was not fraudulent. While Arvin agreed to withdraw the Phoenix Test Burn tape, Arvin

also indicated that other tests may have been conducted over which Arvin had no control.

Because Bacchus presented no evidence in support of its § 1962(d) claim that Arvin employees and agents participated in a conspiracy to violate § 1962(a), (b) or (c), we find that the district court properly granted summary judgment on the RICO conspiracy claim.

### 2. The Common Law Fraud and Misrepresentation Claims

Bacchus claims that the district court erred in granting summary judgment in favor of Arvin on the common law fraud and misrepresentation claims. The communications between Arvin, the sales representatives and Bacchus have been analyzed above and were not found to support a fraud claim. Because Bacchus presented no other evidence in support of these claims, we find that the district court properly granted summary judgment against Bacchus.

### 3. The Commercial Disparagement Claim

■ The district court also granted summary judgment against Bacchus on its commercial disparagement claim against Arvin. In its First Amended Complaint, Bacchus claimed that Arvin "has engaged in publishing, advertising and dissemination of material which gives false descriptions and representations of Plaintiff's products that are in competition with Defendant's products and impugned the quality, genuineness or worth of merchandise or products manufactured by the Plaintiff." R. Doc. 57, ¶ 8.2. The claim that Bacchus appears to state is one "called by various names such as 'disparagement of property,' 'slander of goods,' 'commercial disparagement,' and 'trade libel'" and is now generally referred to as "injurious falsehood." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* 963–64 (5th ed. 1984).

The Restatement (Second) of Torts § 623A states:

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

Bacchus failed to provide any credible evidence that Arvin knowingly published false statements intending to harm the product reputation of Bacchus. We therefore hold that the district court properly granted summary judgment on the commercial disparagement claim.

## B. The Directed Verdict

After the district court granted Arvin's motion for summary judgment on the RICO and common law claims, the only issue remaining for trial was the § 2 Sherman Act claim. At trial, Bacchus presented its evidence in support of this sole remaining claim. At the conclusion of Bacchus's evidence, Arvin made a motion for a directed verdict on the following grounds: 1) plaintiffs have failed to introduce evidence sufficient to establish a "dangerous probability" that Arvin would successfully monopolize the relevant market, and 2) plaintiff's evidence of conspiracy to monopolize is insufficient. Tr. Vol. 5, pp. 843–847. The motion was granted by the trial court and a judgment was entered dismissing the Sherman Antitrust Act claims. R. Doc. 230. Bacchus appeals from that judgment and claims that the evidence introduced by Bacchus was sufficient to support a finding by the jury that there was a dangerous probability of success that Arvin could attain monopoly power over the relevant market.

■■■■ The grant of a directed verdict is reviewed *de novo* by this court using the same standard used by the district court. *Pytlik v. Professional Resources, Ltd.*, 887 F.2d 1371, 1380 (10th Cir.1990). The trial court may grant a motion for a directed verdict only if, viewing the evidence in the light most favorable to the nonmoving party, all the evidence and the inferences to be drawn from it are so clear that reasonable persons could not differ in their conclusions. *Id.; Banghart v. Hollywood General Partnership* 902 F.2d 805, 807 (10th Cir.1990).

To establish a claim under § 2 of the Sherman Antitrust Act, the plaintiff must prove "(1) relevant market (including geographic market and relevant product market) in which the alleged attempt occurred; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt." *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.*, 783 F.2d 159, 161 (10th Cir.1986).

## 1. Relevant Market

■■■■ Without a definition of the relevant market for the product involved, there is no way to measure the defendant's ability to lessen or destroy competition. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). The relevant market consists of both a product market and a geographic market. Bacchus properly defined the relevant market as the residential evaporative cooler market in the twelve western states. A product market includes those products which are reasonably interchangeable by consumers for the same purposes. Bacchus presented testimony that the residential evaporative cooler market was separate and distinct from other forms of residential cooling and from commercial or industrial evaporative cooling. Tr. Vol. 1, pp. 34–36, 42–43. The geographic market consists of the area of effective competition. Bacchus defined the twelve western states as the geographic market because it is within this area that evaporative coolers are most effective and could meet the comfort cooling standards of the American Society of Heating, Refrigeration and Air Conditioning Engineers. Tr. Vol. 1, pp. 38–39, Vol. 3, p. 453.

### 2. Dangerous Probability of Success

To establish the dangerous probability of success element of an attempted monopolization claim, "the plaintiff must show that there was a dangerous probability the defendant would achieve monopoly status as the result of the predatory conduct alleged by the plaintiff." *Colorado Interstate Gas v. Natural Gas Pipeline*, 885 F.2d 683, 693 (10th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990). In this circuit, monopoly power is defined as the ability to control prices and exclude competition. *Reazin v. Blue Cross and Blue Shield of Kansas*, 899 F.2d 951, 967 (10th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990); *Bright v. Moss Ambulance Service, Inc.*, 824 F.2d 819, 824 (10th Cir. 1987). Monopoly power is also commonly thought of as substantial market power. *Reazin*, 899 F.2d at 967. The evaluation of market power includes the examination of market share, but "market share alone is insufficient to establish market power." *Bright*, 824 F.2d at 824. The number and strength of other competitors, market trends and entry barriers should also be considered. *Shoppin' Bag*, 783 F.2d at 162. However, "[a]t the very least it must be shown how much of the relevant market a defendant controls if market power is to be evaluated." *Id.* at 161–62.

At trial, Bacchus attempted to establish Arvin's market share through the testimony of a former Arvin employee and through the testimony of two Bacchus employees. The former Arvin employee testified that he attended an Arvin sales meeting in 1984 during which Arvin's market share was discussed. He estimated that Arvin held about a 55 percent market share at that time in the western region residential market. Tr. Vol. 1, p. 77. Mr. R.E. Bacchus, President of Bacchus Industries, estimated that Arvin had a 60% market share in 1982. Tr. Vol. 5 pp. 827–828, 836. While Mr. Bacchus estimated that Arvin's market share increased in 1986 and 1987, he believed that Arvin held a 60% share in 1988. *Id.* at 837–839. Rocky Bacchus testified that Arvin's market share had declined to 47% in 1987. Tr. Vol. 3, p. 513. Thus, Bacchus did present evidence to support its claim that Arvin held a significant market share.

However, Bacchus failed to present sufficient evidence to show that Arvin could propel itself to monopoly status as a result of predatory practices. Bacchus presented no evidence of Arvin's ability to control prices. With respect to Arvin's ability to eliminate competitors, Bacchus relied on its assertions that Arvin unfairly characterized the Bacchus cooler as a fire hazard in order to eliminate Bacchus as a competitor. However, the main purpose of the antitrust laws is to preserve and promote competition and not to protect a single competitor. Whether or not a practice violates the antitrust laws is determined by its effect on competition and not its effect on an individual competitor. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Bright*, 824 F.2d at 824.

The evidence showed that the residential evaporative cooler market is a highly competitive market with many smaller competitors attempting to produce a better, less expensive product. No significant barriers exist to entry into the market. At trial, Rocky Bacchus described the genesis of the Bacchus cooler from his parents' fiberglass septic tank manufacturing business. Rocky Bacchus built the first Bacchus coolers from the domed septic tank ends manufactured by his parents' business. The circular tank ends gave the Bacchus coolers their distinctive round shape. Tr. Vol. 2, pp. 303–304. This testimony suggests that innovative and daring entrepreneurs may enter the market quickly through modification of existing manufacturing facilities. Without significant barriers to entry, it is unlikely that any one manufacturer could be able to eliminate competition and control prices for any significant period of time. *See generally* Landes & Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937 (1981).

Bacchus failed to present sufficient evidence to create a genuine issue of fact on

the existence of a dangerous probability that Arvin could achieve monopoly status in the residential evaporative cooling market. Therefore, we conclude that the district court properly directed the verdict in Arvin's favor on the attempted monopolization claim.

 Finally, Bacchus claims that the district court improperly directed the verdict on the conspiracy to monopolize claim. To establish a conspiracy to monopolize claim under § 2 of the Sherman Antitrust Act, the plaintiff must show (1) the existence of a combination or conspiracy to monopolize, (2) overt acts done in furtherance of the combination or conspiracy, (3) an effect upon an appreciable amount of interstate commerce, and (4) a specific intent to monopolize. *Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432, 438 (10th Cir.), *cert. denied,* 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983). Bacchus failed to present sufficient evidence which would establish the existence of a combination or conspiracy to monopolize. Because no reasonable jury could have found in favor of Bacchus on the conspiracy to monopolize claim, the district court properly directed the verdict in favor of Arvin.

AFFIRMED.