Tami L. RUSSELL, Plaintiff,

v.

MIDWEST–WERNER & PFLEIDERER,
INC., and Kenneth R. Lehr,
Defendants.

No. 95–4142–SAC.

United States District Court,
D. Kansas.

Oct. 3, 1996.

Brenda L. Head, Davis, Unrein, Hummer & Buck, L.L.P., Topeka, KS, for plaintiff.

Arthur E. Palmer, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

This sexual harassment and constructive discharge case comes before the court on the defendants' motion for summary judgment. (Dk. 49). In March of 1993, the plaintiff, Tami L. Russell ("Russell"), was hired as a receptionist at Midwest–Werner & Pfleiderer, Inc. ("Midwest") and at the time of her discharge in March of 1994 Russell held the position of executive sales assistant at Midwest. The plaintiff brings this Title VII action alleging the defendants subjected her to a sexually hostile working environment that eventually resulted in her constructive discharge. The defendants argue they are entitled to summary judgment on both the hostile work environment claim and the constructive discharge claim.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine

issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

 Summary judgments are "used sparingly in employment discrimination cases." *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir.1995). This is because discrimination claims often turn on the employer's intent, *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992), and courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 530 (10th Cir.1994). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.*, 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds, McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

Drawing all reasonable inferences in the plaintiff's favor, the court finds the following facts for purposes of this summary judgment ruling.

1. Russell worked for Midwest from March of 1993 through March 8, 1994. At the time of her discharge, Russell held an executive sales assistant position.

2. Kenneth R. Lehr ("Lehr") was also hired by Midwest in 1993 as its executive vice president. Lehr reported to Jurgen Pohl, the president and managing director of Werner & Pfleiderer Gmbh in Germany, the parent company of Midwest. Lehr also reported to Adam Herzig, a board director located in Pennsylvania. The three vice presidents at Midwest, Gary Rubin, Vince Boreas and Walter Haeder, reported to Lehr and to officers in Germany. Lehr was the top officer in Midwest's Topeka office.

3. Russell testified that Lehr's sexual harassment of her began with flirtatious acts, like winks, "honeys," "sweetie," patting her on the shoulder, and calling her by pet names. Lehr used the pet names when he telephoned Russell at the office. Russell said that Lehr kept the office temperature low causing her nipples to be erect and that he stared at her breasts during conversations. Lehr sometimes called from his home in New Jersey telling Russell that he missed her and that he could hardly wait to return. Russell also testified that Lehr brought her

gifts and told her that she was wonderful and "too gorgeous to be a granny." Lehr described his sleeping habits with his wife insinuating that his sex life was nothing. Russell characterized Lehr's actions throughout this early period as more like a suitor than a boss.

4. Later in time, Lehr became more aggressive. He touched her on the arm and shoulder. He then rubbed her arms, shoulders and her back under her bra strap. If Russell were standing at the copy or fax machine, Lehr would come up behind her, pretend he was watching, and press his body against her. While she sat at her desk, Lehr would lean over Russell and touch his hip against her shoulder. Sometimes in this same position, Lehr would rub his groin against Russell's shoulders.

5. Russell testified Lehr's harassing actions occurred daily.

6. When Russell protested to Lehr to stop, sometimes he would just laugh and say nothing in excuse. Other times, Lehr would retaliate by yelling at Russell in front of other employees over trivial matters or over things over which she had no responsibility.

7. Lehr's conduct caused Russell's demeanor to change. She became noticeably nervous and jumpy when people approached her from behind. She was upset over Lehr's treatment of her to the point that she cried before other employees on several occasions.

8. A co-employee, Martha Gilfillan, witnessed one occasion when Lehr leaned over Russell and placed his "entire groin area on the back of her shoulder." Gilfillan testified that when this happened Lehr was reaching for something in a basket but that Lehr could have walked around and reached over the partition and grabbed the same papers as he had done many times before. Gilfillan typed up her account of this event and gave the letter to Russell. Gilfillan also testified that Lehr stared at her breasts during conversations with him.

9. On October 17, 1993, Russell spoke to her immediate supervisor Vince Boreas about Lehr's harassment. This was Russell's first complaint to Midwest's management

about Lehr. Boreas advised Russell to put her complaint in writing.

10. At the time, Midwest did not have a written policy against sexual harassment. Nor did it have any written procedures for investigating complaints of sexual harassment.

11. On October 18, 1993, Russell presented Boreas with her letter. Boreas took the letter to Gary Rubin, who was acting personnel manager. Rubin interviewed Russell, Gilfillan, Lehr, and two other employees about the allegations in Russell's letter. This was the first complaint of sexual harassment that Rubin had investigated in his career.

12. Rubin later told Russell that he had talked with Lehr and had told him to stop this behavior. Russell received a letter from the company president, Jorgen Pohl, dated October 24, 1993, that informed her in relevant part:

> Even though Mr. Lehr denies all allegations, we have taken remedial action which includes a directive to Mr. Lehr to avoid any conduct which interferes with your work or creates an offensive work environment.
>
> We believe our action will appropriately correct the situation. We appreciate your having come forward. If there are any further sexual harassment incidents or reprisals against you, please contact me or Mr. Gary Rubin immediately so that we may promptly investigate and take appropriate action.

13. Pohl also sent a letter to Lehr admonishing him to avoid "all unnecessary physical contact with female employees," "the use of sexually suggestive gestures or language," and "the use of pet names or any other conduct which would be offensive to a reasonable employee in similar circumstances."

14. Russell testified that Lehr began laughing at her and treating the situation "like this was all a big joke." While Lehr curtailed his behavior for a while, Russell said that Lehr started all over again. He first began winking, calling her pet names, and brushing against her. Eventually, Lehr's actions "intensified" and the circum-

stances were just as bad as before her complaint. Russell's impression of the situation was that her complaint had just "added fuel to his [Lehr's] fire."

15. By letter dated November 5, 1993, Russell asked "once again" for a copy of Pohl's letter to Lehr.

16. According to Russell, she verbally complained in November, December, and February to Rubin about Lehr's continuing harassment of her. Rubin denies that he had any conversations with Russell about Lehr's continuing conduct.

17. In February, Russell delivered to Rubin a letter dated February 25, 1993, about her continuing complaints with Lehr's conduct. Russell recalls that the situation had intensified to the point that she was crying when she went to Rubin's office. Russell told Rubin that Lehr had put his hands on her, that she had protested, and that he had just laughed and walked away. When Lehr returned later, he yelled at her for something which was not her fault. She told Rubin that she could no longer work under these conditions.

18. With regards to the plaintiff's second complaint, Rubin talked with Lehr and Russell, but he did not conduct the same type of investigation as made on Russell's first complaint. Rubin testified that his latter investigation found no evidence of harassment.

19. On March 1, 1994, Rubin wrote Russell a letter saying in relevant part:

I am disappointed that you did not contact me or Mr. Pohl promptly on the occurrence of the incidents of which you complain, as directed in Mr. Pohl's letter to you of October 21, 1993, because the delay makes investigation more difficult.... It appears from the facts I can verify that Mr. Lehr is complying with Mr. Pohl's directive to him to avoid conduct which might be considered sexually harassing. In short, I do not find your work place would be considered hostile or offensive by reason of sexually inappropriate conduct, but in an abundance of caution, we have admonished Mr. Lehr to avoid conduct which would be offensive to a reasonable employee in the circumstances.

I want to formally confirm my message to you of February 28, 1994, that your position is open and available to you without condition. We expect you to return to work by March 7, 1994, as the work must be done. When you return, we again want you to immediately contact your direct supervisor or Mr. Pohl if there are any incidents of sexual harassment so that we may promptly investigate and take appropriate action.

Russell understood that Midwest would do nothing further on her complaints to date. Russell did not return to her job by March 7, 1994.

## SEXUAL HARASSMENT—HOSTILE WORK ENVIRONMENT

### A. *Governing Law*

Of the two principal theories of sexual harassment recognized under Title VII, the plaintiff's claim rests on a theory of hostile work environment. For harassment to be actionable under Title VII, it must alter the conditions of employment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). To prevail under this theory, the plaintiff must prove that the sexual conduct had " 'the purpose or effect of unreasonably interfering' " with her work performance or created " 'an intimidating, hostile, or offensive working environment.' " *Martin,* 3 F.3d at 1418 (quoting *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05); *see also Eichenwald v. Krigel's, Inc.,* 908 F.Supp. 1531, 1539 (D.Kan.1995).

"[A]n employee may prevail in an action for sexual harassment either if the asserted harassment was 'pervasive' or if there was only a single incident of harassment which, standing alone, was sufficiently severe." *Creamer v. Laidlaw Transit, Inc.,* 86 F.3d 167, 170 (10th Cir.1996), *petition for cert. filed,* —— U.S.L.W. —— (U.S. Sept. 9, 1996) (No. 96–5913). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126

L.Ed.2d 295, 301 (1993) (quoting *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05). The Supreme Court said this standard is the middle ground between one that makes merely offensive conduct actionable and a standard that requires a psychological injury. *Id.* at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 301. A "mere utterance of an ... epithet which engenders offensive feelings in a employee," *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405, does not impact a condition of employment and, therefore, does not implicate Title VII. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302. On the other hand, Title VII becomes an issue before the employee suffers a nervous breakdown. *Id.*

To recover on her claim, the plaintiff must prove the work environment would reasonably be perceived, and was perceived by her, as hostile or abusive. *Id.* The Supreme Court put it this way:

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment and there is no Title VII violation.

510 U.S. at 21–22, 114 S.Ct. at 370, 126 L.Ed.2d at 302. In short, a hostile work environment claim includes elements of both subjective and objective harm to the employee. *Spain v. Gallegos,* 26 F.3d 439, 447 (3rd Cir.1994).

When is a work environment "hostile" or "abusive" is a case-by-case determination guided by no sharply defined rules. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302. "Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances." *Sauers v. Salt Lake County,* 1 F.3d 1122, 1126 (10th Cir.1993). Circumstances to consider in each case include:

the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris,* 510 U.S. at 17, 114 S.Ct. at 369, 126 L.Ed.2d at 302–03. An environment that is discriminatorily abusive "often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris,* 510 U.S. at 22, 114 S.Ct. at 371, 126 L.Ed.2d at 302. These tangible effects are not a precondition to Title VII liability; it is enough to prove the harassing conduct was so severe or pervasive as to create an abusive work environment.

The elements to a hostile-environment sexual-harassment prima facie case are: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the plaintiff's sex; (4) the alleged harassment was sufficient to affect a term or condition of employment; and (5) the employer either actively engaged in the harassment or is in some position on which liability can be imputed. *Eichenwald v. Krigel's, Inc.,* 908 F.Supp. at 1539; *Plakio v. Congregational Home, Inc.,* 902 F.Supp. 1383, 1389 (D.Kan. 1995) (and cases cited in each).

B. *Analysis*

The defendants argue that the plaintiff is unable to prove that the alleged conduct altered a term or condition of her employment or that the conduct was severe or pervasive. In doing so, the defendants highlight only the instances where Lehr called the plaintiff "wonderful" or told her that he missed her. The plaintiff opposes summary judgment citing her testimony on the other alleged acts of harassment comprising her hostile work environment claim.

The holdings in the recent Tenth Circuit decisions of *Winsor v. Hinckley*

*Dodge, Inc.,* 79 F.3d 996 (10th Cir.1996),[1] and *Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777 (10th Cir.1995),[2] convince this court that the plaintiff has come forth with sufficient evidence for her hostile work environment claim. Russell has testified that Lehr: (1) stared at her breasts; (2) called her pet names[3] over the phone and said that he missed her; (3) referred to his sex life with his wife; (4) touched and rubbed her arm and shoulders; (5) rubbed her back under her bra strap; (6) pressed his body against her while she was standing at the copy or fax machine; (7) rubbed his groin against her shoulder; and (8) laughed at her protests to stop and then later retaliated by yelling at her over trivial matters. Russell testified that one or more of these actions occurred almost daily.

The circumstances here match those present in those cases finding actionable harassment, including physical touching, repeated sexually suggestive comments and actions, and demeaning behavior. *See Henry v. Gehl Corp.,* 867 F.Supp. 960, 966 (D.Kan.1994) (and cases cited therein). They are much more than relatively isolated instances of innocuous sexual teasing and more than an occasional offensive utterance. The court is satisfied that it is "quintessentially a question of fact" whether Lehr's harassment was severe or pervasive. *Beardsley v. Webb,* 30 F.3d 524, 530 (4th Cir.1994).

## C. *Midwest's Liability*

▮▮ Midwest contends that Lehr's harassing actions were outside the scope of his authority and that it can be liable only if the plaintiff can prove it was negligent in not taking prompt remedial action against the supervisor. The plaintiff counters that Midwest is not only liable on a negligence theory but also on a theory of imputed liability.

Relying on agency principles, the Tenth Circuit has identified three alternative bases for imposing employer liability for sexual harassment:

> An employer is liable for: (1) any tort committed by an employee acting within the scope of his or her employment; (2) any tort committed by an employee in which the employer was negligent or reckless; or (3) any tort in which the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the employee was aided in accomplishing the tort by the existence of the agency relation.

*Hirase–Doi,* 61 F.3d at 783 (citations omitted). The court finds that the plaintiff has come forth with evidence creating genuine issues of material fact on the second and third alternative bases for employer liability.

▮▮ The second basis—employer negligence—"is defined as 'failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known.'" *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 577 (10th Cir.1990) (quoting *E.E.O.C. v. Hacienda Hotel,* 881 F.2d 1504, 1516 (9th Cir.1989)). In this case, the defendants did investigate the plaintiff's first complaint and issued Lehr a letter directing him to avoid conduct that interfered with Russell's work or that created an offensive work environment. According to the plaintiff's testimony, Lehr did not take the situation seriously, made light of her first complaint, and returned to his harassing conduct. Russell says she continued to complain verbally to Rubin about Lehr's ongoing conduct and apparently nothing was done. Rubin disputes receiving any verbal complaints from Russell during this period. In

---

1. In *Winsor* the working environment consisted of vulgar and offensive epithets based on the plaintiff's gender, pornographic cartoons, and incidents where the plaintiff was pushed against a wall and called names.

2. In *Hirase–Doi* the Tenth Circuit found "more than adequate evidence [of a sexually hostile work environment] to survive summary judgment." 61 F.3d at 783. This evidence included verbal and written sexually offensive remarks to

the plaintiff and an attempt to touch the plaintiff's breast.

3. Names like "honey" and "sweetie" are "not overtly sexual, [but] may be sexual in nature if their use occurs based only on the recipient's gender." *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1000–1001 (10th Cir.1996). There is no evidence that Lehr called male employees by the same names.

February of 1994, the plaintiff complained again in writing to Rubin. The investigation of this second complaint, Rubin admits, was not the same type as his first one.[4] Rubin essentially disbelieved the plaintiff's second complaint and took no further action on the complaint other than to remind Lehr that he should avoid offensive conduct.[5] Construed to favor the plaintiff, the facts are sufficient for a reasonable jury to find that Midwest was negligent in failing to remedy the hostile work environment.

As the highest-level management employee in the Topeka office, Lehr had the apparent authority to fire the plaintiff. Russell's testimony could sustain a finding that Lehr exercised significant control over the plaintiff's conditions of employment and thereby used his supervisory position over her as an aid in his harassment of her. The court finds that the plaintiff may be able to prove Midwest's liability under the third alternative basis. See·Sauers v. Salt Lake County, 1 F.3d at 1125; Eichenwald, 908 F.Supp. at 1566–67; Henry, 867 F.Supp. at 968–69.

### D. Lehr's Liability

■ Prior to 1995, the Tenth Circuit twice held that Title VII "suits against individuals must proceed in their official capacity; individual capacity suits are inappropriate." Sauers v. Salt Lake County, 1 F.3d at 1125; See Lankford v. City of Hobart, 27 F.3d 477, 480 (10th Cir.1994). The panel in Ball v. Renner, 54 F.3d 664 (10th Cir.1995), noted the holding in Brownlee v. Lear Siegler Management Servs. Corp., 15 F.3d 976, 978 (10th Cir.), cert. denied, 512 U.S. 1237, 114 S.Ct. 2743, 129 L.Ed.2d 862 (1994), that an employer's status may be attributed to an agent making the agent individually liable on an age discrimination claim. The Ball decision said that Brownlee muddied the waters on individual liability suits under Title VII.

Most recently, a panel in Haynes v. Williams, 88 F.3d 898, 900–01 (10th Cir. 1996), read Brownlee as not deviating from prior precedent but reflecting on "a different agency principle that leaves Sauers' distinct holding about individual supervisor liability intact." The panel in Haynes also restated the established rules that:

> A published decision of one panel of this court constitutes binding circuit precedent constraining subsequent panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court. (citations omitted). A pertinent corollary to this principle is that when faced with an intracircuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom. (citations omitted).

88 F.3d at 900 n. 4. Consequently, the Tenth Circuit's "established, pre-amendment rule that personal capacity suits against individual supervisors are inappropriate under Title VII" continues to be the law of this circuit.

### CONSTRUCTIVE DISCHARGE

■ Though an employee may not be formally discharged, an employee may be constructively discharged if the employer deliberately made or allowed the employee's working conditions to become so intolerable that the employee was forced to quit. Cockrell v. Boise Cascade Corp., 781 F.2d 173, 177 (10th Cir.1986). To prove her constructive discharge claim, the plaintiff must show that the employer's conduct resulted in working conditions that a reasonable person would view as intolerable. Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379, 1386 (10th Cir.1991). The plaintiff also must show that the employer's illegal discriminatory conduct caused the intolerable work conditions, Bolden v. PRC, Inc., 43 F.3d 545, 552

---

**4.** The plaintiff testified that her first complaint became a laughing matter for Lehr and fueled his fire for harassing her. Humiliating treatment, in apparent retaliation for a complaint of sexual harassment, is "sufficiently related to the prior alleged sexual harassment that ... [it] could be found to constitute continuing sexual harassment in violation of Title VII." Hirase–Doi v. U.S. West Communications, Inc., 61· F.3d 777, 784 n. 3 (10th Cir.1995).

**5.** Since Lehr was a management-level employee and he not only knew of the sexual harassment, he was the harasser, there is a factual basis for imputing liability to Midwest based solely on the plaintiff's testimony of ongoing harassment by Lehr. .

(10th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995), and caused her to leave, *Eichenwald v. Krigel's, Inc.,* 908 F.Supp. at 1540.

As summarized above, the facts viewed in the light most favorable to the plaintiff show that Lehr sexually harassed her and retaliated whenever she complained. The employer failed and ultimately refused to take the steps necessary to remedy this situation. This resulted in work conditions that a reasonable person could consider intolerable. The court finds that summary judgment is not appropriate on this claim.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (Dk. 49) is granted as to the defendant Lehr's individual liability under Title VII and denied in all other respects.