**Lisa Y. JONES, Plaintiff,**

v.

**Jo Anne B. BARNHART, Defendant.**

**No. Civ.A. 01–2017–KHV.**

United States District Court, D. Kansas.

Aug. 20, 2002.

Steven D. Steinhilber, Charles H. McKenzie, Accurso Law Firm, Kansas City, MO, for Plaintiff.

Christopher Allman, Office of United States Attorney, Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Lisa Y. Jones brings race discrimination and retaliation claims against Jo Anne B. Barnhart, Commissioner of Social Security, under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* This matter comes before the Court on *Defendant's Motion For Summary Judgment* (Doc. # 45) filed March 18, 2002. For reasons stated below, the Court sustains defendant's motion.

## I. Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it

"might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *See Applied Genetics,* 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it

is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## II. Facts

The following facts are either uncontroverted or construed in a light most favorable to plaintiff:

### A. Plaintiff's Work At The Social Security Administration

Plaintiff, an African American, worked at the Kansas City office of the Social Security Administration ("SSA") for nearly ten years, from July 29, 1990 to January 19, 2000. Since 1995, and maybe earlier, plaintiff has worked as a legal assistant. Plaintiff's duties included assembling claimant records, providing legal support to paralegal specialists and administrative law judges ("ALJs"); screening medical records and procedural documentation; summarizing medical records; extracting evidentiary documentation from claim folders; creating exhibit folders; recommending use of vocational and medical expert testimony; corresponding with claimants, attorneys, employers and state and federal agencies regarding procedural matters; determining and drafting issues regarding alleged disabilities; case management; drafting remand and dismissal orders regarding procedural deficiencies; and processing attorney fee petitions.

From 1993 to 1996, Janet Bayless supervised plaintiff. Bayless thought that plaintiff was a bad employee because "[s]he didn't apply herself. She was always ... causing conflict and disruptions among other employees, and she just didn't sit down and do her work." Bayless Depo., Defendant Exhibit 16 at 27 ll. 9–13.

In 1995, plaintiff worked as a legal assistant to ALJ Keith Sickendick. Judge Sickendick testified that plaintiff was competent and generally cooperative. To the

extent that he asked plaintiff to change or do things differently, she complied. In the beginning of their work relationship, Judge Sickendick had hoped that plaintiff could do some writing for him, like drafting decisions. He asked her to draft short letters but they were unacceptable. In particular, Judge Sickendick found that plaintiff had poor English usage and grammar, and he did not have time to work with plaintiff on her writing.

Plaintiff's co-employees regarded her as outspoken, confrontational and temperamental. Judge Sickendick testified that "[plaintiff] is a confrontational person, and [she] did not hesitate to come and tell me at any time what was on her mind or what she was thinking and sometimes that's— you know, that can be difficult to deal with, but we always managed to work through that." Sickendick Depo., Defendant Exhibit 18 at 52 ll. 11–16. Another co-employee testified that plaintiff did not always speak in a professional tone of voice: "generally she's outspoken and—and could be angry and use more of an angry tone at times when she was expressing her opinions." Spence Depo., Defendant Exhibit 19 at 47–48 ll. 18–4.

### B. Paralegal Specialist Positions

In November 1997, plaintiff applied for one of three paralegal specialist positions which were funded on a temporary basis from 12 to 24 months. A 1996 bargaining agreement covered the positions and established the following hiring procedures: A selecting official chose a four-member assessment panel which consisted of two bargaining unit volunteers and two non-bargaining unit volunteers. The assessment panel scored the job applicants based on criteria established by the central office. The panel found a natural break in the scores to create a list of the best qualified candidates. The human resources specialist gave the selecting official a list of the best qualified applicants in alphabetical order, without indicating the scores. The selecting official then picked the winning candidate.[1]

Bruce Haydon, supervisory attorney advisor, was the selecting official for the paralegal specialist positions.[2] Haydon selected the following persons for the assessment panel: union members Ethel Zimmerman and Rose Shingleton, both paralegal specialists, and non-union members Jeanetta Jenkins, hearing office manager, and Sallie Edwards, regional management officer. Jenkins and Edwards are African American, Zimmerman is Caucasian and Shingleton is Hispanic.

The assessment panel applied an objective scoring system based in part on years of education and experience. Formal paralegal training was not a prerequisite for the paralegal specialist positions. In fact, the assessment criteria allowed an equal number of points for internal training programs and formal paralegal training. The primary focus was not formal education, but the amount of time spent in the next lower job grade. The panel was very impressed with plaintiff's qualifica-

---

1. Before 1996, the collective bargaining agreement required the human resource specialist to assign a score to each application based on a set of national weights and factors. The human resource specialist then sorted the scores on a best qualified list and sent the top applicant names and scores to the selecting official. Absent some justification, the selecting official was required to select the highest scoring individual.

2. Haydon has worked as an SSA attorney since he graduated from law school in 1981. From November 1989 to January 2000, he worked as supervisory attorney advisor in the Kansas City office. Since January 2000, Haydon has worked as senior attorney advisor in the Kansas City office.

tions and gave her a score which tied for the sixth highest. The six candidates with the same or higher scores were Caucasian. Ultimately, the panel decided to give Haydon a list of 12 to 14 well qualified candidates. Initially, the panel considered giving Haydon a list of fewer names, which included plaintiff. Jenkins suggested, however, that the panel lower the bar to include more candidates in the best qualified pool. Shingleton objected that lowering the line would be unfair to the top scoring candidates. The other panel members voted to lower the bar, however, so the panel gave Haydon a list of 12 to 14 well qualified candidates. Plaintiff was the only African American on the list.

Haydon selected three Caucasian women for the paralegal specialist positions: Barbara Raposa, a legal assistant, and Janet Bayless and Paula Florance, who were hearing office supervisors. All three had panel assessment scores which were lower than plaintiff's. Haydon testified that he selected the individuals based on his own criteria. He did not know and did not want to know the panel scores.[3] Haydon understood that everyone on the list was well qualified and that he could select the individuals who he thought were best suited for the jobs. No one told Haydon which candidates to select.

The well qualified list which Haydon used in making his selections contained a code for the race of each individual. An "E" was typed in the race column for all but two candidates. One candidate had an "A" typed in the column by his or her name, and plaintiff had a "C" handwritten in the column by her name. Plaintiff speculates that "C" could stand for colored. Defendant maintains that "C" is the government's code for African American. Neither party has presented sworn testimony on the issue.[4] Plaintiff and many other candidates also had a handwritten "NS" next to their names, indicating "not selected." Haydon admits that he made some of the handwritten notes on the list, but denies that he wrote "C" next to plaintiff's name.[5]

In choosing the paralegal specialists, Haydon focused on who could get up to speed quickly in the new positions.[6] *See* Haydon Declaration ¶ 20, Defendant Exhibit 5. Decision writing was the main focus of the positions and because of a huge backlog of cases, the SSA expected them to write almost two decisions a day. In the past, new decision writers had required six to twelve months to become fully productive. Haydon sought persons who would not need substantial writing or computer training. Haydon believed that

---

**3.** Haydon could have calculated the panel scores for each individual if he wanted to do so.

**4.** The parties also do not state the meaning of "E" and "A".

**5.** Haydon does not recall seeing race codes on his list, but his signature is on the document. *See* Plaintiff Exhibit 9. Defendant argues that Haydon saw another version of the document which was not coded for race. *See Defendant's Reply To Plaintiff's Response To Defendant's Motion For Summary Judgment* (Doc. # 64) filed July 18, 2002 at 122–123; Defendant Exhibit 25. Both copies of the list—with and without race codes—contain Haydon's signature. Construed in the light most favor-

able to plaintiff, the record supports an inference that Haydon used a list which contained race codes. Plaintiff presents no evidence, however, that Haydon knew the meaning of the race codes.

**6.** Haydon took notes when he interviewed the candidates, but he destroyed them after he made his decisions. He kept a limited file on plaintiff and three other pending personnel matters until he became senior attorney advisor in January 2000. After he became senior attorney advisor, Haydon destroyed the files because he was no longer a supervisor. Haydon believed that keeping the files would violate SSA policy and the Privacy Act of 1974, and plaintiff does not claim that he destroyed them in bad faith.

every candidate on the well qualified list could make good use of training on decision writing, but he also did not know when the next training session would be available. He estimated that the successful candidates would have to work three to six months without formal training, and he also believed that formal training was inadequate in several respects.

Haydon also considered whether the applicants would get along well with the ALJs. When he interviewed plaintiff, Haydon believed that she was a good worker who did not have time or attendance problems. Haydon had not had any run-ins with plaintiff, or any reason to discipline her.[7]

Haydon chose Bayless because (1) Bayless had participated in the employee development program ("EDP");[8] (2) Bayless had worked in the tele-service center, which required extensive knowledge of SSA programs; (3) Bayless had most recently worked as a hearing office supervisor, where she supervised legal assistants and hearing clerks and both her employees and the ALJs came to her with problems; (4) Bayless had experience drafting reports, memoranda and letters on the antiquated computers in the Kansas City office; (5) the Kansas City office was overstaffed with an extra hearing office supervisor and promoting Bayless would correct that problem; and (6) as a hearing office supervisor, Bayless had dealt with ALJs in a non-subservient manner, which Haydon believed would be beneficial because decision writers sometimes had to confront ALJs in a non-adversarial manner regarding potential factual or legal errors. *See* Haydon Declaration ¶¶ 27–33.

Haydon picked Florance because (1) Florance also had most recently worked as a hearing office supervisor; (2) Florance also had experience drafting reports, memoranda and letters on the antiquated computers in the Kansas City office; (3) Florance also had experience dealing with ALJs in a non-subservient manner; and (4) by selecting another hearing office supervisor, SSA could "back fill" her position, creating the potential for three other temporary promotions.[9] *See* Haydon Declaration ¶¶ 34–39.

Haydon selected Raposa because (1) Raposa had worked as a paralegal specialist for 120 days during 1996 and performed well writing opinions and working on the computers; and (2) Raposa had experience working on Medicare part B cases, a specialty which other candidates did not have. *See* Haydon Declaration ¶¶ 40–46.

On December 3, 1997, plaintiff learned that she did not get a paralegal specialist position. Plaintiff was the only candidate with a paralegal certificate, and she had trained on more modern computer equipment than the successful candidates.

---

7. Plaintiff argues that Haydon did not choose her because the ALJs sometimes made inappropriate comments and Haydon knew that plaintiff was outspoken on racial issues. Even construed in the light most favorable to plaintiff, however, the evidence does not support her contention. Haydon testified that *after the fact*, knowing what he now knows, he would be concerned about plaintiff's sensitivity to ALJ comments regarding mental illness. *See* Haydon Depo., Plaintiff Exhibit 2 at 139–141. He also testified that although he has heard other ALJs make inappropriate racial comments, he has never heard such a comment in the Kansas City office. *See id.* at 141.

Haydon repeatedly denied that he did not choose plaintiff because she was outspoken regarding racial issues. *See id.* at 142, 145–46.

8. To Haydon, her participation in the EDP indicated that other SSA employees had identified Bayless as an individual who would have a long and successful SSA career.

9. Defendant presents evidence that promoting plaintiff would have created the potential for only two other temporary promotions, but it does not explain why. *See* Haydon Declaration ¶ 39.

Plaintiff thought that she was more qualified than the successful candidates and that she could have quickly learned the paralegal specialist duties.

Shingleton, who had served on the assessment panel, was surprised that plaintiff did not receive the promotion. Shingleton believed that plaintiff was a hard worker and good writer, upbeat and bright, and that she always stepped in. at the last minute to do a good job. Shingleton thought that the selection process was set up and that the successful candidates were pre-determined favorites for the jobs. Shingleton did not believe, however, that the successful candidates were favored because of race.

On January 26, 1998, plaintiff filed a complaint of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discriminatory failure to promote. In March 2000, plaintiff amended her complaint to include retaliation and constructive discharge.

On December 28, 1999, plaintiff notified SSA that she intended to resign effective January 19, 2000. Plaintiff told SSA employees that she was leaving to return to the military full time, which she did. Plaintiff's military salary is less than she earned at SSA, but she enjoys other benefits such as early retirement.

### C. Hostile Environment/Retaliation

Plaintiff alleges that defendant subjected her to a racially hostile work environment beginning December 3, 1997, when she learned that she did not receive the paralegal specialist position. Plaintiff also claims that defendant retaliated against her because she engaged in protected activity by filing an EEO complaint.

### 1. Case Assignments

From October 1999 to January 2000, Barbara Lane supervised plaintiff. During this time Lane did not believe that plaintiff was a troublemaker or a problem employee. Plaintiff claims, however, that Lane gave her unfair or undesirable case assignments. Some of the cases had the term "Black Hawk and the special education district" or otherwise paralleled unfortunate events in plaintiff's personal life. The record is unclear why cases with the term "Black Hawk and the special education district" were unfair or undesirable, or how they paralleled unfortunate events in plaintiff's personal life. Plaintiff's daughter was in a mental hospital, however, and some of her family members were sick or involved with criminal matters.

Supervisors in the Kansas City office generally assigned cases to legal assistants without reviewing the claim files. Because of the large number of cases and the large size of claim files, it was impractical for supervisors to screen cases which offended plaintiff or anyone else. About 90 per cent of the Kansas City cases involved disabilities, and at least 50 per cent of the disability claimants had mental conditions. Many claimants also had a difficult history with the law, including incarceration.

### 2. Meeting With Judge Sickendick

After plaintiff had complained of discrimination, Haydon and Judge Sickendick came into plaintiff's work area and Judge Sickendick called an impromptu meeting.[10] Judge Sickendick announced, "well did you see this black and white [flier], you know, that [Haydon] put out? You know, [Haydon] has to do everything now in black and white."[11] Haydon giggled at the comments. The timing of the meeting and the

---

**10.** The record does not reflect when Judge Sickendick held the impromptu meeting. Judge Sickendick and other ALJs normally held monthly and impromptu staff meetings in the open area near plaintiff's desk.

**11.** Judge Sickendick does not recall making

conduct of Judge Sickendick and Haydon offended plaintiff. She thought that they were trying to intimidate her because she had filed an EEO complaint.

### 3. Goodbye Card

After Bayless learned that plaintiff was leaving SSA, she selected a card for plaintiff from a group of cards which she had previously purchased. The front of the card displayed a picture of Caucasian workers sitting at desks with stacks of paper. The preprinted message stated: "Without you at work, what will we do ...?" The preprinted message in the inside of the card read: "Talk about you at lunch probably. Goodbye and Good Luck!"

Bayless wrote the following message inside the card:

Lisa,
Talk about you at lunch probably. Maybe you'll *inspire* others!
Good bye and Good Luck!

Janet   Keep in touch
Janet.Bayless@SSA.GOV

Bayless states that at the time she gave plaintiff the card, she did not know that plaintiff believed that SSA had discriminated and retaliated against her. *See* Bayless Declaration ¶ 2, Defendant Exhibit 11. Bayless thought that the picture of workers resembled a group of legal assistants. When she purchased the card and when she gave it to plaintiff, she did not notice the race of the workers on the card. *See* Bayless Deposition at 11–12 ll. 16–8, Defendant Exhibit 16.

### 4. Barbie Cupcake

Each month the employees in the Kansas City office held a potluck birthday luncheon in the multi-purpose room.[12] At the luncheon, all birthday employees were called forward and received a birthday card. In addition to the monthly luncheon, many employees informally celebrated birthdays with cards, cakes and food. Lane (plaintiff's supervisor) frequently purchased baked goods and brought in food for management birthdays.

Lane's birthday was January 7, 2000. That morning, Haydon purchased a package of six cupcakes from his local grocery store and brought them to the office. The cupcakes contained toothpicks with pictures of Caucasian and African American Barbie dolls. Haydon states that he picked the cupcakes because he thought it would be cute to bring Barbie cupcakes for a person named Barbara. *See* Haydon Declaration ¶ 69.

Haydon gave the package of cupcakes to Lane, who took one.[13] Later that day, at a meeting with decision writers, Haydon again offered the cupcakes. The decision writers took three or four,[14] and Haydon

---

any specific comments about black and white. *See* Sickendick Declaration ¶ 4, Defendant Exhibit 7. He states that "[m]ost likely if there was a reference about a document being there in black and white, we were referring to the fact that we had given both employee unions the required written notice of the meeting. The staff union was particularly adamant that we comply with the written notice requirement before group meetings with the staff." *Id.*

**12.** The multi-purpose room is large enough to accommodate the entire Kansas City office staff.

**13.** Haydon does not remember which cupcake Lane selected.

**14.** Haydon does not remember which cupcakes the decision writers selected.

offered the remaining one or two cupcakes to employees who sat outside the meeting room, including plaintiff. Haydon does not remember which cupcakes remained, but plaintiff refused a cupcake without comment and Shirley Foster, another African American, accepted a cupcake without comment.

At the time he offered the cupcakes, Haydon knew that plaintiff believed that she was a victim of racial discrimination. It was out of the ordinary for Haydon to distribute food in plaintiff's work area. SSA employees usually held informal birthday celebrations in the kitchen area. Haydon did not tell plaintiff that the cupcakes were for a birthday celebration or that he had chosen Barbie characters because it was Barbara Lane's birthday. Employees usually placed food for general consumption in the multi-purpose room and made an announcement over the loud speaker. Haydon states that he did not do this because the multi-purpose room was on the other side of the office and he only had one or two cupcakes. *See* Haydon Declaration ¶ 69.

Later that day, plaintiff sent an e-mail to ALJ Jesse Butler, Haydon's supervisor, who is African American. In the e-mail, plaintiff stated that she was offended by the fact that Haydon had offered her a cupcake with an African American Barbie doll, and copied Haydon on the e-mail. Haydon replied by e-mail to both plaintiff and Butler, stating that he did not mean to offend plaintiff. Haydon did not apologize to plaintiff in person.

### D. Racial Makeup Of Kansas City Office

The Kansas City office has 29 positions higher than paralegal specialist.[15] Of those positions, two are held by African Americans: attorney Tracy Henry and ALJ Butler. Haydon felt a bit uncomfort-

able about the fact that the upper end of the hierarchy in the Kansas City office was so "lily white." Haydon Depo., Plaintiff Exhibit 2 at 79 ll. 19–24 (quoting attorney question). The Kansas City office can find African Americans who are qualified to perform lower level positions, but it has not found African Americans who were qualified and available to fill the higher level positions. Consequently, more African Americans work in lower level positions in the Kansas City office.

Before he selected the paralegal specialists, Haydon had served as selecting official at least 12 times. Haydon did not select an African American for any of the 12 positions. Around the time plaintiff applied for paralegal specialist, Haydon was in charge of hiring an attorney. He hired Tracy Henry, an African American attorney. Haydon did not know Henry's race at the time he selected her.

### III. Analysis

Plaintiff claims that defendant discriminated against her on the basis of race by not promoting her to paralegal specialist. Plaintiff further claims that defendant subjected her to a racially hostile work environment beginning December 3, 1997 and retaliated against her for exercising her EEO rights.

### A. Failure To Promote

Defendant asserts that plaintiff cannot show pretext on her failure to promote claim. Because plaintiff relies on indirect evidence to demonstrate discriminatory intent, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). For summary judgment purposes, defendant concedes that plaintiff has established a

---

**15.** The record is unclear whether the positions are higher in pay, authority or both.

prima facie case. Thus the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions. *See Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1533 (10th Cir.1995). If defendant articulates a legitimate nondiscriminatory reason, the burden shifts to plaintiff to present evidence sufficient on which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir.1998) (quoting *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995)). Plaintiff may show pretext by showing either that a discriminatory reason more likely motivated defendant or that defendant's proffered explanation in unworthy of credence. *See Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir.1994).

■ Defendant contends that it promoted Raposa, Florance and Bayless because Haydon believed that they could come up to speed faster in the new positions. Because defendant states a legitimate nondiscriminatory reason for its actions, the burden shifts to plaintiff to show evidence of pretext. Evidence of pretext may take a variety of forms. *See Aramburu v. Boeing*, 112 F.3d 1398, 1411 n. 10 (10th Cir. 1997). Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (quotations omitted). Typically, a plaintiff demonstrates pretext with evidence that (1) defendant's stated reason for the adverse action was false; (2) defendant acted contrary to written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse decision. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000).

■ Plaintiff challenges the veracity of defendant's explanation for the adverse action by asserting that she was objectively more qualified than the successful candidates. Specifically, plaintiff asserts that she (1) received a higher score from the assessment panel, (2) had more education and (3) had better computer training. The Court can infer pretext when plaintiff was more qualified than the successful candidates. *See Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457–58 (10th Cir.1994). In this case, however, the undisputed fact is that Haydon was the sole decision maker, and he did not know (or want to know) the panel scores. As a result, he could not have intentionally by-passed plaintiff to favor a lower-scoring candidate. Furthermore, Haydon passed over all seven of the top-scoring candidates, which included six Caucasians. Moreover, because plaintiff tied for sixth highest on the panel scores, she would not have received the promotion even if Haydon had looked solely to objective criteria. On this record, plaintiff's evidence regarding the panel scores may support an inference that she was objectively more qualified than the successful candidates, in terms of her panel score. The undisputed evidence, however, is that the sole decision maker did not employ strictly objective criteria in making his decision—and that even if he had employed strictly objective panel scores as his sole selection criteria, he would not have hired plaintiff. Furthermore, nothing about plaintiff's score impugns Haydon's stated belief that Raposa, Florance and Bayless could more quickly get up to speed in the new positions.

With respect to plaintiff argument that she had more education, the evidence is undisputed that formal paralegal training

was not a job requirement, and that the primary focus of the assessment criteria was the amount of time spent in the next lower job grade.[16] Plaintiff presents no facts which compare her next lower job grade experiences to those of the successful candidates. Also, the fact that plaintiff was trained on more modern computer equipment has little consequence in light of the undisputed evidence that the paralegal specialists worked on antiquated computers. Again, plaintiff's evidence regarding her education and computer training do not support an inference of pretext.

Plaintiff also argues that the SSA's lack of African American employees in high level positions shows that defendant has a policy and practice of discrimination, but she makes no attempt to eliminate non-discriminatory reasons for the alleged numerical disparities. *See Martinez v. State of Wyoming*, 218 F.3d 1133, 1138 (10th Cir.2000) (quoting *Rea*, 29 F.3d at 1456). Her statistical evidence is therefore unreliable, *id.*, and does not create a genuine issue of material fact.

Finally, plaintiff argues that the assessment panel lowered her chances of receiving the promotion by lowering the bar and increasing the number of applicants in the best qualified pool. Even so, plaintiff has not shown that the panel lowered the bar for discriminatory reasons or that she would have received the position if the panel had not lowered the bar.[17] In sum,

plaintiff has not presented evidence sufficient to establish pretext on her failure to promote claim.[18]

### B. Hostile Work Environment

In order to survive summary judgment, plaintiff must allege facts which support the inference of a racially hostile work environment, *see Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and support a basis for liability. *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1417–18 (10th Cir.1987). Specifically, plaintiff must show that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions or privileges of employment; and (2) the harassment was racial or stemmed from racial animus. *See Meritor*, 477 U.S. at 67, 106 S.Ct. 2399. General harassment is not actionable. *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994). Plaintiff must "show more than a few isolated incidents of racial enmity." *Id.* (quotation and citation omitted). "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Id.*

Plaintiff asserts that the following evidence demonstrates a hostile work environment: (1) defendant staffed African American employees in lower level positions in the Kansas City office; (2) defendant chose less qualified Caucasian employees over plaintiff for the three

---

16. The assessment panel's scoring system was partially based on years of education, so plaintiff's formal paralegal training is accounted for in her panel score and her argument in this respect overlaps with the argument that in light of her panel scores, she was more qualified than the successful applicants.

17. Given the racial composition of the assessment panel (two African Americans, one Caucasian and one Hispanic), it is doubtful that the panel lowered the bar to discriminate against plaintiff on account of her race, and plaintiff does not make such a claim.

18. Plaintiff does not argue that the use of race codes on the well qualified list demonstrates pretext. On this record, the Court would likely reject such an argument. As discussed previously, plaintiff presents no evidence which undermines Haydon's stated reasons for selecting the other candidates. Furthermore, the record contains no evidence that the Haydon considered the race codes in any way in making his decision.

paralegal specialist positions; (3) Haydon offered plaintiff a cupcake with an African American Barbie doll; (4) Bayless gave plaintiff a good-bye card which depicted Caucasian workers; (5) Judge Sickendick called an impromptu meeting and used the words "black and white" next to plaintiff's desk; and (6) Lane assigned cases to plaintiff which reflected stressful issues in plaintiff's personal life.[19]

Even when considered in a light most favorable to plaintiff, the evidence does not support an inference of racial harassment. As discussed earlier, plaintiff has not shown a genuine issue of material fact with respect to defendant's failure to promote plaintiff or other African American employees. With respect to the remaining allegations, plaintiff has not shown that they were pervasive or severe enough to alter the terms, conditions or privileges of her employment. For a two-year period, plaintiff cites three instances of allegedly offensive conduct which are relatively trivial in degree and did not clearly stem from racial animus,[20] as opposed to innocent reasons. Such isolated instances of racial harassment (if they even can fairly be classified as racial harassment) are not actionable. Plaintiff also complains of unfavorable case assignments, but she offers no plausible explanation regarding how, when or by whom such a strategy could have been implemented. Plaintiff's unsubstantiated belief that she was the victim of unfavorable case assignments does not de-

feat defendant's motion for summary judgment on this record.

## C. Retaliation

To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) defendant subjected her to adverse employment action; and (3) a causal connection exists between the adverse employment action and her protected activity. *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir.1998).

■ Plaintiff contends that defendant did not promote her because she was outspoken in the office regarding racial issues. In order to establish that she engaged in protected activity under Title VII, plaintiff must show that she either participated in a Title VII investigation or opposed Title VII violations. *See* 42 U.S.C. § 2000e–3(a). Plaintiff presents no facts regarding the circumstances in which she allegedly spoke out on racial issues. At most, plaintiff presents evidence that her co-workers generally regarded her as outspoken on racial issues. On this record, a reasonable jury would not find that plaintiff's outspokenness constituted protected activity under Title VII.

■ Plaintiff also argues that defendant retaliated against her after she made an EEO complaint by (1) assigning her unfavorable cases and (2) subjecting her to inappropriate gestures and comments.[21] Although the Tenth Circuit liberally de-

---

**19.** In the argument section of her brief, plaintiff asserts that defendant also created a hostile work environment by denying her computer equipment. Plaintiff presents no such evidence in her statement of facts, so the Court does not consider this claim. In any event, even if the Court considered such claim, it would not change the outcome herein.

**20.** The Court is particularly confused by plaintiff's arguments regarding the Barbie

cupcake and the good-bye card. On one hand, plaintiff was offended by an African American Barbie cupcake, but on the other hand she was offended by a good-bye card which depicted only Caucasian workers.

**21.** Plaintiff does not elaborate regarding the comments and gestures which she considers to be retaliatory. *See Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 56) filed May 31, 2002 at 56.

fines adverse employment action, it "does not extend to a mere inconvenience or an alteration of job responsibilities." *Sanchez*, 164 F.3d at 532 (citations and quotations omitted). In addition, oral reprimands and derogatory comments do not constitute adverse employment actions absent evidence that they had some impact on the employee's employment status. *See id.* at 533. Plaintiff has not shown that the case assignments, gestures and comments had a negative impact on her employment status. Thus plaintiff has not established that such action constitutes adverse employment action.

**IT IS THEREFORE ORDERED** that *Defendant's Motion For Summary Judgment* (Doc. # 45) filed March 18, 2002 be and hereby is **SUSTAINED.**